188 U.S. 321
 23 S.Ct. 321
 47 L.Ed. 492
 CHARLES F. CHAMPION, Appt.,
v.
JOHN C. AMES, United States Marshal.
 No. 2.
 Argued February 27, 28, 1901.
 Ordered for reargument April 29, 1901.
 Reargued October 16, 17, 1901.
 
 Ordered for reargument before full bench November 10, 1902.
 Reargued December 15, 16, 1902.
 Decided February 23, 1903.
 The general question arising upon this appeal involves the constitutionality of the 1st section of the act of Congress of March 2d, 1895, chap. 191, entitled 'An Act for the Suppression of Lottery Traffic through National and Interstate Commerce and the Postal Service, Subject to the Jurisdiction and Laws of the United States.' 28 Stat. at L. 963, U. S. Comp. Stat. 1901, p. 3178.
 The appeal was from an order of the circuit court of the United States for the northern district of Illinois dismissing a writ of habeas corpus sued out by the appellant Champion, who in his application complained that he was restrained of his liberty by the Marshal of the United States in violation of the Constitution and laws of the United States.
 It appears that the accused was under indictment in the district court of the United States for the northern district of Texas for a conspiracy under § 5440 of the Revised Statues (U. S. Comp. Stat. 1901, p. 3676), providing that 'if two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than one thousand dollars and not more than ten thousand dollars, and to imprisonment not more than two years.'
 He was arrested at Chicago under a warrant based upon a complaint in writing, under oath, charging him with conspiring with others, at Dallas, in the northern district of Texas, to commmit the offense denounced in the above act of 1895; and the object of the arrest was to compel his appearance in the Federal court in Texas to answer the indictment against him.
 The 1st section of the act 1895, upon which the indictment was based, is as follows: '§ 1. That any person who shall cause to be brought within the United States from abroad, for the purpose of disposing of the same, or deposited in or carried by the mails of the United States, or carried from one state to another in the United States, any paper, certificate, or instrument purporting to be or represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, socalled gift concert, or similar enterprise, offering prizes dependent upon lot or chance, or shall cause any advertisement of such lottery, so-called gift concert, or similar enterprise, offering prizes dependent upon lot or chance, to be brought into the United States, or deposited in or carried by the mails of the United States, or transferred from one state to another in the same, shall be punishable in [for] the first offense by imprisonment for not more than two years, or by a fine of not more than $1,000, or both, and in the second and after offenses by such imprisonment only.' 28 Stat. at L. 963. U. S. Comp. Stat. 1901, p. 3178.
 The indictment charged, in its first count, that on or about the 1st day of February, A. D. 1899, in Dallas county, Texas, 'C. F. Champion, alias W. W. Ogden, W. F. Champion, and Charles B. Park did then and there unlawfully, knowingly, and feloniously conspire together to commit an offense against the United States, to wit, for the purpose of disposing of the same, to cause to be carried from one state to another in the United States, to wit, from Dallas, in the state of Texas, to Fresno, in the state of California, certain papers, certificates, and instruments purporting to be and representing tickets, as they then and there well knew, chances, shares, and interests in and dependent upon the event of a lottery, offering prizes dependent upon lot and chance, that is to say, caused to be carried, as aforesaid, for the purpose of disposing of the same, papers, certificates, or instruments purporting to be tickets to represent the chances, shares, and interests in the prizes which by lot and chance might be awarded to persons, to these grand jurors unknown, who might purchase said papers, certificates, and instruments representing and purporting to be tickets, as aforesaid, with the numbers thereon shown and indicated and printed, which by lot and chance should, on a certain day, draw a prize or prizer at the purported lottery or chance company, to wit, at the purported monthly drawing of the so-called Pan-American Lottery Company, which purported to draw monthly at Asuncion, Paraguay, which said Pan-American Lottery Company purported to be an enterprise offering prizes defendent upon lot and chance, the specific method of such drawing being unknown to the grand jurors, but which said papers, certificates, and instruments purporting to be and representing tickets upon their face purporting to be entitled to participation in the drawing for a certain capital prize amounting to the sum of $32,000, and which said drawings for said capital prize, or the part or parts thereof allotted or to be allotted in conformity with the scheme of lot and chance, were to take place monthly, the nanner and form of which is to the grand jurors unknown, but that said drawing and lot and chance by which said prize or prizes were to be drawn was purported to be under the supervision and direction of Enrigue Montes de Leon, manager, and Bernardo Lopez, intervener, and which said papers, certificates, and instruments purporting to be tickets of the said Pan-American Lottery Company were so divided as to be called whole, half, quarter, and eighth tickets, the whole tickets to be sold for the sum of $2, the half tickets for the sum of $1, the quarter tickets for the sum of 50 cents and the eighth tickets for the sum of 25 cents.'
 The indictment further charged that 'in pursuance to said conspiracy, and to effect the object thereof, to wit, for the purpose of causing to be carried from one state to another in the United States, to wit from the state of Texas to the state of California aforesaid, for the purpose of disposing of the same, papers, certificates, and instruments purporting to be and representing tickets, chances, and shares and interests in and dependent upon lot and chance, as aforesaid, as they then and there well knew, said W. F. Champion and Charles B. Park did then and there, to wit, on or about the day last aforesaid, in the year 1899, in the county aforesaid, in the Dallas division of the northern district of Texas aforesaid, unlawfully, knowingly, and feloniously, for the purpose of being carried from one state to another in the United States, to wit, from Dallas, in the state of Texas, to Fresno, in the state of California, for the purpose of disposing of the same, deposit and cause to be deposited and shipped and carried with and by the Wells-Fargo Express Company, a corporation engaged in carrying freight and packages from station to station along and over lines of railway, and from Dallas, Texas, to Fresno, California, for hire, one certain box or package containing, among other things, two whole tickets or papers or certificates of said purported Pan-American Lottery Company, one of which said whole tickets is hereto annexed by the grand jury to this indictment and made a part hereof.'
 It thus appears that the carrying in this case was by an incorporated express company, engaged in transporting freight and packages from one state to another.
 The commissioner who issued the warrant of arrest, having found that there was probable cause to believe that Champion was guilty of the offense charged, ordered that he give bond for his appearance for trial in the district court of the United States for the northern district of Texas, or in default thereof to be committed to jail. Having declined to give the required bond the accused was taken into custody. Rev. Stat. § 1014 (U. S. Comp. Stat. 1901, p. 716). Thereupon he sued out the present writ of habeas corpus upon the theory that the act of 1895, under which it was proposed to try him, was void, under the Constitution of the United States.
 Messrs. Moritz Rosenthal, William D. Guthrie, and Joseph B. David for appellant on original argument.
 Mr. William D. Guthrie for appellant on rearguments.
 [Argument of Counsel from pages 325-335 intentionally omitted]
 Assistant Attorney General Beck for appellee.
 [Argument of Counsel from pages 335-344 intentionally omitted]
 Mr. Justice Harlan delivered the opinion of the court:
 
 
 1
 The appellant insists that the carrying of lottery tickets from one state to another state by an express company engaged in carrying freight and packages from state to statc, although such tickets may be contained in a box or package, does not constitute, and cannot by any act of Congress be legally made to constitute, commerce among the states within the meaning of the clause of the Constitution of the United States providing that Congress shall have power 'to regulate commerce with foreign nations, and among the several states, and with the Indian tribes;' consequently, that Congress cannot make it an offense to cause such tickets to be carried from one state to another.
 
 
 2
 The government insists that express companies, when engaged, for hire, in the business of transportation from one state to another, are instrumentalities of commerce among the states; that the carrying of lottery tickets from one state to another is commerce which Congress may regulate; and that as a means of executing the power to regulate interstate commerce Congress may make it an offense against the United States to cause lottery tickets to be carried from one state to another.
 
 
 3
 The questions presented by these opposing contentions are of great moment, and are entitled to receive, as they have received, the most careful consideration.
 
 
 4
 What is the import of the word 'commerce' as used in the Constitution? It is not defined by that instrument. Undoubtedly, the carrying from one state to another by independent carriers of things or commodities that are ordinary subjects of traffic, and which have in themselves a recognized value in money, constitutes interstate commerce. But does not commerce among the several states include something more? Does not the carrying from one state to another, by independent carriers, of lottery tickets that entitle the holder to the payment of a certain amount of money therein specified, also constitute commerce among the states?
 
 
 5
 It is contended by the parties that these questions are answered in the former decisions of this court, the government insisting that the principles heretofore announced support its position, while the contrary is confidently asserted by the appellant. This makes it necessary to ascertain the import of such decisions. Upon that inquiry we now enter, premising that some propositions were advanced in argument that need not be considered. In the examination of former judgments it will be best to look at them somewhat in the order in which they were rendered. When prior adjudications have been thus collated the particular grounds upon which the judgment in the present case must necessarily rest can be readily determined. We may here remark that some of the cases referred to may not bear directly upon the questions necessary to be decided, but attention will be directed to them as throwing light upon the general inquiry as to the meaning and scope of the commerce clause of the Constitution.
 
 
 6
 The leading case under the commerce clause of the Constitution is Gibbons v. Ogden, 9 Wheat. 1, 189, 194, 6 L. ed. 23, 68, 69. Referring to that clause, Chief Justice Marshall said: 'The subject to be regulated is commerce; and our Constitution being, as was aptly said at the bar, one of enumeration, and not of definition, to ascertain the extent of the power it becomes necessary to settle the meaning of the word. The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation. This would restrict a general term, applicable to many objects, to one of its significations. Commerce, undoubtedly, is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse. . . . It has been truly said that commerce, as the word is used in the Constitution, is a unit, every part of which is indicated by the term. If this be the admitted meaning of the word, in its application to foreign nations, it must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain, intelligible cause which alters it. The subject to which the power is next applied is to commerce 'among the several states.' The word 'among' means intermingled with. A thing which is among others is intermingled with them. Commerce among the states cannot stop at the external boundary line of each state, but may be introduced into the interior. It is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. Such a power would be inconvenient, and is certainly unnecessary. Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more states than one. . . . The genius and character of the whole government seem to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. . . .'
 
 
 7
 Again: 'We are now arrived at the inquiry,—What is this power? It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This by which commerce is to be boverned. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution. These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar. If, as has always been understood, the sovereignty of Congress, though limited to specific objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States.'
 
 
 8
 Mr. Justice Johnson, in the same case, expressed his entire approbation of the judgment rendered by the court, but delivered a separate opinion indicating the precise grounds upon which his conclusion rested. Referring to the grant of power over commerce, he said: 'My opinion is founded on the application of the words of the grant to the subject of it. The 'power to regulate commerce' here meant to be granted was that power to regulate commerce which previously existed in the states. But what was that power? The states were, unquestionably, supreme; and each possessed that power over commerce which is acknowledged to reside in every sovereign state. . . . The law of nations, regarding man as a social animal, pronounces all commerce legitimate in a state of peace, until prohibited by positive law. The power of a sovereign state over commerce, therefore, amounts to nothing more than a power to limit and restrain it at pleasure. And since the power to prescribe the limits to its freedom necessarily implies the power to determine what shall remain unrestrained, it follows that the power must be exclusive; it can reside but in one potentate; and hence the grant of this power carries with it the whole subject, leaving nothing for the state to act upon.'
 
 
 9
 The principles announced in Gibbons v. Ogden were reaffirmed in Brown v. Maryland, 12 Wheat. 419, 446, 6 L. ed. 678, 688. After expressing doubt whether any of the evils proceeding from the feebleness of the Federal government contributed more to the establishing of the present constitutional system than the deep and general conviction that commerce ought to be regulated by Congress, Chief Justice Marshall, speaking for the court, said: 'It is not, therefore, matter of surprise that the grant should be as extensive as the mischief, and should comprehend all foreign commerce, and all commerce among the states.' Considering the question as to the just extent of the power to regulate commerce with foreign nations and among the several states, the court reaffirmed the doctrine that the power was 'complete in itself, and to acknowledge no limitations other than are prescribed by the Constitution. . . . Commerce is intercourse; one of its most ordinary ingredients is traffic.'
 
 
 10
 In the Passenger Cases, 7 How. 283, 12 L. ed. 702, the court adjudged certain statutes of New York and Massachusetts, imposing taxes upon alien passengers arriving in the ports of those states, to be in violation of the Constitution and laws of the United States. In the separate opinions delivered by the justices there will not be found any expression of doubt as to the doctrines announced in Gibbons v. Ogden. Mr. Justice McLean said: 'Commerce is defined to be 'an exchange of commodities.' But this definition does not convey the full meaning of the term. It includes 'navigation and intercourse.' That the transportation of passengers is a part of commerce is not now an open question.' Mr. Justice Grier said: 'Commerce, as defined by this court, means something more than traffic,—it is intercourse; and the power committed to Congress to regulate commerce is exercised by prescribing rules for carrying on that intercourse.' The same views were expressed by Mr. Justice Wayne, in his separate opinion. He regarded the question then before the court as covered by the decision in Gibbons v. Ogden, and in respect to that case he said: 'It [the case] will always be a high and honorable proof of the eminence of the American bar of that day, and of the talents and distinguished ability of the judges who were then in the places which we now occupy.' Mr. Justice Catron and Mr. Justice McKinley announced substantially the same views.
 
 
 11
 In Almy v. California, 24 How. 169, 16 L. ed. 644, a statute of California imposing a stamp duty upon bills of lading for gold or silver transported from that state to any port or place out of the state was held to be a tax on exports, in violation of the provision of the Constitution declaring that 'no tax' or duty shall be laid on articles exported from any state.' But in Woodruff v. Parham, 8 Wall. 123, 138, 19 L. ed. 382, 386, this court, referring to the Almy Case, said it was well decided upon a ground not mentioned in the opinion of the court, namely, that, although the tax there in question was only on bills of lading, 'such a tax was a regulation of commerce, a tax imposed upon the transportation of goods from one state to another, over the high seas, in conflict with that freedom of transit of goods and persons between one state and another, which is within the rule laid down in Crandall v. Nevada [6 Wall. 35, 18 L. ed. 744], and with the authority of Congress to regulate commerce among the states.'
 
 
 12
 In Henderson v. New York 92 U. S. 259, 270, sub nom. Henderson v. Wickham, 23 L. ed. 543, 548, which involved the constitutional validity of a statute of New York relating to vessels bringing passengers to that port, this court, speaking by Mr. Justice Miller, said: 'As already indicated, the provisions of the Constitution of the United States, on which the principal reliance is placed to make void the statute of New York, is that which gives to Congress the power 'to regulate commerce with foreign nations.' As was said in United States v. Holliday, 3 Wall. 417, 18 L. ed. 185, 'commerce with foreign nations means commerce between citizens of the United States and citizens or subjects of foreign governments.' It means trade, and it means intercourse. It means commercial intercurse between nations, and parts of nations, in all its branches. It includes navigation, as the principal means by which foreign intercourse is effected. To regulate this trade and intercourse is to prescribe the rules by which it shall be conducted. 'The mind,' says the great Chief Justice, 'can scarcely conceive a system for regulating commerce between nations which shall exclude all laws concerning navigation, which shall be silent on the admission of the vessels of one nation into the ports of another;' and he might have added, with equal force, which prescribed no terms for the admission of their cargo or their passengers. Gibbons v. Ogden, 9 Wheat. 190, 6 L. ed. 68.'
 
 
 13
 The question of the scope of the commerce clause was again considered in Pensacola Teleg. Co. v. Western U. Teleg. Co. 96 U. S. 1, 9, 12, 24 L. ed. 708, 710, 712, involving the validity of a statute of Florida, which assumed to confer upon a local telegraph company the exclusive right to establish and maintain lines of electric telegraph in certain counties of Florida. This court held the act to be unconstitutional. Chief Justice Waite, delivering its judgment, said: 'Since the case of Gibbons v. Ogden, 9 Wheat. 1, 6 L. ed. 23, it has never been doubted that commercial intercourse is an element of commerce which comes within the regulating power of Congress. Postoffices and post roads are established to facilitate the transmission of intelligence. Both commerce and the postal service are placed within the power of Congress, because, being national in their operation, they should be under the protecting care of the national government. The powers thus granted are not confined to the instrumentalities of commerce or the postal service known or in use when the Constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances. They extend from the horse with its rider to the stage coach, from the sailing vessel to the steamboat, from the coach and the steamboat to the railroad, and from the railroad to the telegraph, as these new agencies are successively brought into use to meet the demands of increasing population and wealth. They were intended for the government of the business to which they relate, at all times and under all circumstances. As they were intrusted to the general government for the good of the nation it is not only the right, but the duty, of Congress to see to it that intercourse among the states and the transsion of intelligence are not obstructed or unnecessarily encumbered by state legislation. The electric telegraph marks an epoch in the progress of time. In a little more than a quarter of a century it has changed the habits of business, and become one of the necessities of commerce. It is indispensable as a means of intercommunication, but especially is it so in commercial transactions.' In his dissenting opinion in that case Mr. Justice Field speaks of the importance of the telegraph 'as a means of intercourse,' and of its constant use in commercial transactions.
 
 
 14
 In Mobile County v. Kimball, 102 U. S. 691, 26 L. ed. 238, Mr. Justice Field, delivering the judgment of the court, said: 'Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' This principle was expressly reaffirmed in Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 203, 29 L. ed. 158, 161, 1 Inters. Com. Rep. 382, 5 Sup. Ct. Rep. 826.
 
 
 15
 Applying the doctrine announced in Pensacola Teleg. Co. v. Western U. Teleg. Co., it was held in Western U. Teleg. Co. v. Texas, 105 U. S. 460, 26 L. ed. 1067, that the law of a state imposing a tax on private telegraph messages sent out of the state was unconstitutional, as being, in effect, a regulation of interstate commerce.
 
 
 16
 In Brown v. Houston, 114 U. S. 630, 29 L. ed. 260, 5 Sup. Ct. Rep. 1095, it was declared by the court, speaking by Mr. Justice Bradley, that 'the power to regulate commerce among the several states is granted to Congress in terms as absolute as is the power to regulate commerce with foreign nations.' The same thought was expressed in Bowman v. Chicago & N. W. R. Co. 125 U. S. 482, 31 L. ed. 706, 1 Inters. Com. Rep. 823, 8 Sup. Ct. Rep. 689, 1062; Crutcher v. Kentucky, 141 U. S. 47, 58, 35 L. ed. 649, 652, 11 Sup. Ct. Rep. 851, and Pittsburg & S. Coal Co. v. Bates, 156 U. S. 587, 39 L. ed. 543, 5 Inters. Com. Rep. 30, 15 Sup. Ct. Rep. 415.
 
 
 17
 In Pickard v. Pullman Southern Car Co. 117 U. S. 34, 29 L. ed. 785, 6 Sup. Ct. Rep. 635, it was said to be settled by the adjudged cases that to tax 'the transit of passengers from foreign countries or between the states is to regulate commerce.'
 
 
 18
 In Western U. Teleg. Co. v. Pendleton, 122 U. S. 347, 356, 30 L. ed. 1187, 1188, 1 Inters. Com. Rep. 306, 7 Sup. Ct. Rep. 1126, the court recognized the commerce with foreign countries and among the states which Congress could regulate as including not only the exchange and transportation of commodities, or visible, tangible things, but the carriage of persons, and the transmission by telegraph of ideas, wishes, orders, and intelligence. See also Ratterman v. Western U. Teleg. Co. 127 U. S. 411, 32 L. ed. 229, 2 Inters. Com. Rep. 59, 8 Sup. Ct. Rep. 1127, and Leloup v. Port of Mobile, 127 U. S. 640, 32 L. ed. 311, 2 Inters. Com. Rep. 134, 8 Sup. Ct. Rep. 1380.
 
 
 19
 In Covington & C. Bridge Co. v. Kentucky, 154 U. S. 204, 218, 38 L. ed. 962, 968, 4 Inters. Com. Rep. 649, 656, 14 Sup. Ct. Rep. 1087, 1092, the question was as to the validity, under the commerce clause of the Constitution, of an act of the Kentucky legislature relating to tolls to be charged or received for passing over the bridge of the Covington & Cincinnati Bridge Company, a corporation of both Kentucky and Ohio, erected between Covington and Cincinnati. A state enactment prescribing a rate of toll on the bridge was held to be unconstitutional, as an unauthorized regulation of interstate commerce. The court, reaffirming the principles announced in Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 29 L. ed. 158, 1 Inters. Com. Rep. 382, 5 Sup. Ct. Rep. 826, and in Wabash, St. L. & P. R. Co. v. Illinois, 118 U. S. 557, 30 L. ed. 244, 1 Inters. Com. Rep. 31, 7 Sup. Ct. Rep. 4, said, among other things: 'Commerce was defined in Gibbons v. Ogden, 9 Wheat. 1, 189, 6 L. ed. 23, 68, to be 'intercourse,' and the thousands of people who daily pass and repass over this bridge may be as truly said to be engaged in commerce as if they were shipping cargoes of merchandise from New York to Liverpool. While the bridge company is not itself a common carrier, it affords a highway for such carriage, and a toll upon such bridge is as much a tax upon commerce as a toll upon a turnpike is a tax upon the traffic of such turnpike, or the charges upon a ferry a tax upon the commerce across a river.'
 
 
 20
 At the present term of the court we said that 'transportation for others, as an independent business, is commerce, irrespective of the purpose to sell or retain the goods which the owner may entertain with regard to them after they shall have been delivered.' Hanley v. Kansas City Southern R. Co. 187 U. S. 617, ante, p. 214, 23 Sup. Ct. Rep. 214.
 
 
 21
 This reference to prior adjudications could be extended if it were necessary to do so. The cases cited, however, sufficiently indicate the grounds upon which this court has proceeded when determining the meaning and scope of the commerce clause. They show that commerce among the states embraces navigation, intercourse, communication, traffic, the transit of persons, and the transmission of messages by telegraph. They also show that the power to regulate commerce among the several states is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States; that such power is plenary, complete in itself, and may be exerted by Congress to its utmost extent, subject only to such limitations as the Constitution imposes upon the exercise of the powers granted by it; and that in determining the character of the regulations to be adopted Congress has a large discretion which is not to be controlled by the courts, simply because, in their opinion, such regulations may not be the best or most effective that could be employed.
 
 
 22
 We come, then, to inquire whether there is any solid foundation upon which to rest the contention that Congress may not regulate the carrying of lottery tickets from one state to another, at least by corporations or companies whose business it is, for hire, to carry tangible property from one state to another.
 
 
 23
 It was said in argument that lottery tickets are not of any real or substantial value in themselves, and therefore are not subjects of commerce. If that were conceded to be the only legal test as to what are to be deemed subjects of the commerce that may be regulated by Congress, we cannot accept as accurate the broad statement that such tickets are of no value. Upon their face they showed that the lottery company offered a large capital prize, to be paid to the holder of the ticket winning the prize at the drawing advertised to be held at Asuncion, Paraguay. Money was placed on deposit in different banks in the United States to be applied by the agents representing the lottery company to the prompt payment of prizes. These tickets were the subject of traffic; they could have been sold; and the holder was assured that the company would pay to him the amount of the prize drawn. That the holder might not have been able to enforce his claim in the courts of any country making the drawing of lotteries illegal, and forbidding the circulation of lottery tickets, did not change the fact that the tickets issued by the foreign company represented so much money payable to the person holding them and who might draw the prizes affixed to them. Even if a holder did not draw a prize, the tickets, before the drawing, had a money value in the market among those who chose to sell or buy lottery tickets. In short, a lottery ticket is a subject of traffic, and is so designated in the act of 1895. 28 Stat. at L. 963, U. S. Comp. Stat. 1901, p. 3178. That fact is not without significance in view of what this court has said. That act, counsel for the accused well remarks, was intended to supplement the provisions of prior acts, excluding lottery tickets from the mails, and prohibiting the importation of lottery matter from abroad, and to prohibit the act of causing lottery tickets to be carried, and lottery tickets and lottery advertisements to be transferred from one state to another by any means or method. 15 Stat. at L. 196, chap. 246; 17 Stat. at L. 302, chap. 335; 19 Stat. at L. 90, chap. 186; Rev. Stat. § 3894, U. S. Comp. Stat. 1901, p. 2659; 26 Stat. at L. 465, chap. 908; 28 Stat. at L. 963, chap. 191, U. S. Comp. Stat. 1901, p. 3178.
 
 
 24
 We are of opinion that lottery tickets are subjects of traffic, and therefore are subjects of commerce, and the regulation of the carriage of such tickets from state to state, at least by independent carriers, is a regulation of commerce among the several states.
 
 
 25
 But it is said that the statute in question does not regulate the carrying of lottery tickets from state to state, but by punishing those who cause them to be so carried Congress in effect prohibits such carrying; that in respect of the carrying from one state to another of articles or things that are, in fact, or according to usage in business, the subjects of commerce, the authority given Congress was not to prohibit, but only to regulate. This view was earnestly pressed at the bar by learned counsel, and must be examined.
 
 
 26
 It is to be remarked that the Constitution does not define what is to be deemed a legitimate regulation of interstate commerce. In Gibbons v. Ogden it was said that the power to regulate such commerce is the power to prescribe the rule by which it is to be governed. But this general observation leaves it to be determined, when the question comes before the court, whether Congress, in prescribing a particular rule, has exceeded its power under the Constitution. While our government must be acknowledged by all to be one of enumerated powers (McCulloch v. Maryland, 4 Wheat. 316, 405, 407, 4 L. ed. 579, 601), the Constitution does not attempt to set forth all the means by which such powers may be carried into execution. It leaves to Congress a large discretion as to the means that may be employed in executing a given power. The sound construction of the Constitution, this court has said, 'must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional.' 4 Wheat. 421, 4 L. ed. 605.
 
 
 27
 We have said that the carrying from state to state of lottery tickets constitutes interstate commerce, and that the regulation of such commerce is within the power of Congress under the Constitution. Are we prepared to say that a provision which is, in effect, a prokibition of the carriage of such articles from state to state is not a fit or appropriate mode for the regulation of that particular kind of commerce? If lottery traffic, carried on through interstate commerce, is a matter of which Congress may take cognizance and over which its power may be exerted, can it be possible that it must tolerate the traffic, and simply regulate the manner in which it may be carried on? Or may not Congress, for the protection of the people of all the states, and under the power to regulate interstate commerce, devise such means, within the scope of the Constitution, and not prohibited by it, as will drive that traffic out of commerce among the states?
 
 
 28
 In determining whether regulation may not under some circumstances properly take the from or have the effect of prohibition, the nature of the interstate traffic which it was sought by the act of May 2d, 1895, to suppress cannot be overlooked. When enacting that statute Congress no doubt shared the views upon the subject of lotteries heretofore expressed by this court. In Phalen v. Virginia, 8 How. 163, 168, 12 L. ed. 1030, after observing that the suppression of nuisances injurious to public health or morality is among the most important duties of government, this court said: 'Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.' In other cases we have adjudged that authority given by legislative enactment to carry on a lottery, although based upon a consideration in money, was not protected by the contract clause of the Constitution; this, for the reason that no state may bargain away its power to protect the public morals, nor excuse its failure to perform a public duty by saying that it had agreed, by legislative enactment, not to do so. Stone v. Mississippi, 101 U. S. 814, 25 L. ed. 1079; Douglas v. Kentucky, 168 U. S. 488, 42 L. ed. 553, 18 Sup. Ct. Rep. 199.
 
 
 29
 If a state, when considering legislation for the suppression of lotteries within its own limits, may properly take into view the evils that inhere in the raising of money, in that mode, why may not Congress, invested with the power to regulate commerce among the several states, provide that such commerce shall not be polluted by the carrying of lottery tickets from one state to another? In this connection it must not be forgotten that the power of Congress to regulate commerce among the states is plenary, is complete in itself, and is subject to no limitations except such as may be found in the Constitution. What provision in that instrument can be regarded as limiting the exercise of the power granted? What clause can be cited which, in any degree, countenances the suggestion that one may, of right, carry or cause to be carried from one state to another that which will harm the public morals? We cannot think of any clause of that instrument that could possibly be invoked by those who assert their right to send lottery tickets from state to state except the one providing that no person shall be deprived of his liberty without due process of law. We have said that the liberty protected by the Constitution embraces the right to be free in the enjoyment of one's faculties; 'to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper.' Allgeyer v. Louisiana, 165 U. S. 578, 589, 41 L. ed. 832, 835, 17 Sup. Ct. Rep. 427, 431. But surely it will not be said to be a part of anyone's liberty, as recognized by the supreme law of the land, that he shall be allowed to introduce into commerce among the states an element that will be confessedly injurious to the public morals.
 
 
 30
 If it be said that the act of 1894 is inconsistent with the 10th Amendment, reserving to the states respectively, or to the people, the powers not delegated to the United States, the answer is that the power to regulate commerce among the states has been expressly delegated to Congress.
 
 
 31
 Besides, Congress, by that act, does not assume to interfere with traffic or commerce in lottery tickets carried on exclusively within the limits of any state, but has in view only commerce of that kind among the several states. It has not assumed to interfere with the completely internal affairs of any state, and has only legislated in respect of a matter which concerns the people of the United States. As a state may, for the purpose of guarding the morals of its own people, forbid all sales of lottery tickets within its limits, so Congress, for the purpose of guarding the people of the United States against the 'widespread pestilence of lotteries' and to protect the commerce which concerns all the states, may prohibit the carrying of lottery tickets from one state to another. In legislating upon the subject of the traffic in lottery tickets, as carried on through interstate commerce, Congress only supplemented the action of those states—perhaps all of them—which, for the protection of the public morals, prohibit the drawing of lotteries, as well as the sale or circulation of lottery tickets, within their respective limits. It said, in effect, that it would not permit the declared policy of the states, which sought to protect their people against the mischiefs of the lottery business, to be overthrown or disregarded by the agency of interstate commerce. We should hesitate long before adjudging that an evil of such appalling character, carried on through interstate commerce, cannot be met and crushed by the only power competent to that end. We say competent to that end, because Congress alone has the power to occupy, by legislation, the whole field of interstate commerce. What was said by this court upon a former occasion may well be here repeated: 'The framers of the Constitution never intended that the legislative power of the nation should find itself incapable of disposing of a subject-matter specifically committed to its charge.' Re Rahrer, 140 U. S. 545, 563, sub nom. Wilkerson v. Rahrer, 35 L. ed. 572, 577, 11 Sup. Ct. Rep. 865, 869. If the carrying of lottery tickets from one state to another be interstate commerce, and if Congress is of opinion that an effective regulation for the suppression of lotteries, carried on through such commerce, is to make it a criminal offense to cause lottery tickets to be carried from one state to another, we know of no authority in the courts to hold that the means thus devised are not appropriate and necessary to protect the country at large against a species of interstate commerce which, although in general use and somewhat favored in both national and state legislation in the early history of the country, has grown into disrepute, and has become offensive to the entire people of the nation. It is a kind of traffic which no one can be entitled to pursue as of right.
 
 
 32
 That regulation may sometimes appropriately assume the form of prohibition is also illustrated by the case of diseased cattle, transported from one state to another. Such cattle may have, notwithstanding their condition, a value in money for some purposes, and yet it cannot be doubted that Congress, under its power to regulate commerce, may either provide for their being inspected before transportation begins, or, in its discretion, may prohibit their being transported from one state to another. Indeed, by the act of May 29th, 1884, chap. 60 [23 Stat. at L. 32, § 6, U. S. Comp. Stat. 1901, p. 3184], Congress has provided: 'That no railroad company within the United States, or the owners or masters of any steam or sailing, or other vessel or boat, shall receive for transportation or transport, from one state or territory to another, or from any state into the District of Columbia, or from the District into any state, any live stock affected with any contagious, infectious, or communicable disease, and especially the disease known as pleuro-pneumonia; nor shall any person, company, or corporation deliver for such transportation to any railroad company or master or owner of any boat or vessel, any live stock, knowing them to be affected with any contagious, infectious, or communicable disease; nor shall any person, company, or corporation drive on foot or transport in private conveyance from one state or territory to another, or from any state into the District of Columbia, or from the District into any state, any live stock, knowing them to be affected with any contagious, infectious, or communicable disease, and especially the disease known as pleuro-pneumonia.' Reid v. Colorado, 187 U. S. 137, ante, 92, 23 Sup. Ct. Rep. 92.
 
 
 33
 The act of July 2d, 1890 (26 Stat. at L. 209, chap. 647, U. S. Comp. Stat. 1901, p. 3200), known as the Sherman anti-trust act, and which is based upon the power of Congress to regulate commerce among the states, is an illustration of the proposition that regulation may take the form of prohibition. The object of that act was to protect trade and commerce against unlawful restraints and monopolies. To accomplish that object Congress declared certain contracts to be illegal. That act, in effect, prohibited the doing of certain things, and its prohibitory clauses have been sustained in several cases as valid under the power of Congress to regulate interstate commerce. United States v. Trans-Missouri Freight Asso. 166 U. S. 290, 41 L. ed. 1007, 17 Sup. Ct. Rep. 540; United States v. Joint Traffic Asso. 171 U. S. 505, 43 L. ed. 259, 19 Sup. Ct. Rep. 25; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 44 L. ed. 136, 20 Sup. Ct. Rep. 96. In the case last named the court, referring to the power of Congress to regulate commerce among the states, said: 'In Gibbons v. Ogden, 9 Wheat. 1, 6 L. ed. 23, the power was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the Constitution. Under this grant of power to Congress that body, in our judgment, may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corporations where the natural and direct effect of such a contract will be, when carried out, to directly, and not as a mere incident to other and innocent purposes, regulate to any substantial extent interstate commerce. (And when we speak of interstate we also include in our meaning foreign commerce.) We do not assent to the correctness of the proposition that the constitutional guaranty of liberty to the individual to enter into private contracts limits the power of Congress and prevents it from legislating upon the subject of contracts of the class mentioned. The power to regulate interstate commerce is, as stated by Chief Justice Marshall, full and complete in Congress, and there is no limitation in the grant of the power which excludes private contracts of the nature in question from the jurisdiction of that body. Nor is any such limitation contained in that other clause of the Constitution, which provides that no person shall be deprived of life, liberty, or property without due process of law.' Again: 'The provision in the Constitution does not, as we believe, exclude Congress from legislating with regard to contracts of the above nature while in the exercise of its constitutional right to regulate commerce among the states. On the contrary, we think the provision regarding the liberty of the citizen is, to some extent, limited by the commerce clause of the Constitution, and that the power of Congress to regulate interstate commerce comprises the right to enact a lwa prohibiting the citizen from entering into those private contracts which directly and substantially, and not merely indirectly, remotely, incidentally, and collaterally, regulate to a greater or less degree commerce among the states.'
 
 
 34
 That regulation may sometimes take the form or have the effect of prohibition is also illustrated in the case of Re Rahrer, 140 U. S. 545, sub nom. Wilkerson v. Rahrer, 35 L. ed. 572, 11 Sup. Ct. Rep. 865. In Mugler v. Kansas, 123 U. S. 623, 31 L. ed. 205, 8 Sup. Ct. Rep. 273, it was adjudged that state legislation prohibiting the manufacture of spirituous, malt, vinous, fermented, or other intoxicating liquors within the limits of the state, to be there sold or bartered for general use as a beverage, does not necessarily infringe any right, privilege, or immunity secured by the Constitution of the United States or by the amendments thereto. Subsequently in Bowman v. Chicago & N. W. R. Co. 125 U. S. 465, 31 L. ed. 700, 1 Inters. Com. Rep. 823, 8 Sup. Ct. Rep. 689, 1062, this court held that ardent spirits, distilled liquors, ale, and beer were subjects of exchange, barter, and traffic, and were so recognized by the usages of the commercial world, as well as by the laws of Congress and the decisions of the courts. In Leisy v. Hardin, 135 U. S. 100, 110, 125, 34 L. ed. 128, 132, 138, 3 Inters. Com. Rep. 36, 41, 47, 10 Sup. Ct. Rep. 681, 684, 690, the court again held that spirituous liquors were recognized articles of commerce, and declared a statute of Iowa prohibiting the sale within its limits of any intoxicating liquors, except for pharmaceutical, medicinal, chemical, or sacramental purposes, under a state license, to be repugnant to the commerce clause of the Constitution, if applied to the sale, within the state, by the importer, in the original, unbroken packages, of such liquors manufactured in and brought from another state. And in determining whether a state could prohibit the sale within its limits, in original, unbroken packages, of ardent spirits, distilled liquors, ale, and beer, imported from another state, this court said that they were recognized by the laws of Congress as well as by the commercial world as 'subjects of exchange, barter, and traffic,' and that 'whatever our individual views may be as to the deleterious or dangerous qualities of particular articles, we cannot hold that any articles which Congress recognized as subjects of commerce are not such.'
 
 
 35
 Then followed the passage by Congress of the act of August 8th, 1890 (26 Stat. at L. 313, chap. 728, U. S. Comp. Stat. 1901, p. 3177), providing 'that all fermented, distilled, or other intoxicating liquors or liquids transported into any state or territory, or remaining therein for use, consumption, sale, or storage therein, shall, upon arrival in such state or territory, be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such state or territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise.' That act was sustained in the Rahrer Case as a valid exercise of the power of Congress to regulate commerce among the states.
 
 
 36
 In Rhodes v. Iowa, 170 U. S. 412, 426, 42 L. ed. 1088, 1096, 18 Sup. Ct. Rep. 664, 669, that statute—all of its provisions being regarded—was held as not causing the power of the state to attach to an interstate commerce shipment of intoxicating liquors 'whilst the merchandise was in transit under such shipment, and until its arrival at the point of destination and delivery there to the consignee.'
 
 
 37
 Thus, under its power to regulate interstate commerce, as involved in the transportation, in original packages, of ardent spirits from one state to another, Congress, by the necessary effect of the act of 1890, made it impossible to transport such packages to places within a prohibitory state and there dispose of their contents by sale; although it had been previously held that ardent spirits were recognized articles of commerce and, until Congress otherwise provided, could be imported into a state, and sold in the original packages, despite the will of the state. If at the time of the passage of the act of 1890 all the states had enacted liquor laws prohibiting the sale of intoxicating liquors within their respective limits, then the act would have had the necessary effect to exclude ardent spirits altogether from commerce among the states; for no one would ship, for purposes of sale, packages containing such spirits to points within any state that forbade their sale at any time or place, even in unbroken packages, and, in addition, provided for the seizure and forfeiture of such packages. So that we have in the Rahrer Case a recognition of the principle that the power of Congress to regulate interstate commerce may sometimes be exerted with the effect of excluding particular articles from such commerce.
 
 
 38
 It is said, however, that if, in order to suppress lotteries carried on through interstate commerce, Congress may exclude lottery tickets from such commerce, that principle leads necessarily to the conclusion that Congress may arbitrarily exclude from commerce among the states any article, commodity, or thing, of whatever kind or nature, or however useful or valuable, which it may choose, no matter with what motive, to declare shall not be carried from one state to another. It will be time enough to consider the constitutionality of such legislation when we must do so. The present case does not require the court to declare the full extent of the power that Congress may exercise in the regulation of commerce among the states. We may, however, repeat, in this connection, what the court has heretofore said, that the power of Congress to regulate commerce among the states, although plenary, cannot be deemed arbitrary, since it is subject to such limitations or restrictions as are prescribed by the Constitution. This power, therefore, may not be exercised so as to infringe rights secured or protected by that instrument. It would not be difficult to imagine legislation that would be justly liable to such an objection as that stated, and be hostile to the objects for the accomplishment of which Congress was invested with the general power to regulate commerce among the several states. But, as often said, the possible abuse of a power is not an argument against its existence. There is probably no governmental power that may not be exerted to the injury of the public. If what is done by Congress is manifestly in excess of the powers granted to it, then upon the courts will rest the duty of adjudging that its action is neither legal nor binding upon the people. But if what Congress does is within the limits of its power, and is simply unwise or injurious, the remedy is that suggested by Chief Justice Marshall in Gibbons v. Ogden, when he said: 'The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments.'
 
 
 39
 The whole subject is too important, and the questions suggested by its consideration are too difficult of solution, to justify any attempt to lay down a rule for determining in advance the validity of every statute that may be enacted under the commerce clause. We decide nothing more in the present case than that lottery tickets are subjects of traffic among those who choose to sell or buy them; that the carriage of such tickets by independent carriers from one state to another is therefore interstate commerce; that under its power to regulate commerce among the several states Congress—subject to the limitations imposed by the Constitution upon the exercise of the powers granted—has plenary authority over such commerce, and may prohibit the carriage of such tickets from state to state; and that legislation to that end, and of that character, is not inconsistent with any limitation or restriction imposed upon the exercise of the powers granted to Congress.
 
 
 40
 The judgment is affirmed.
 
 
 41
 Mr. Chief Justice Fuller, with whom concur Mr. Justice Brewer, Mr. Justice Shiras, and Mr. Justice Peckham, dissenting:
 
 
 42
 Although the 1st section of the act of March 2, 1895 (28 Stat. at L. 963, chap. 191, U. S. Comp. Stat. 1901, p. 3178), is inartificially drawn, I accept the contention of the government that it makes it an offense (1) to bring lottery matter from abroad into the United States; (2) to cause such matter to be deposited in or carried by the mails of the United States; (3) to cause such matter to be carried from one state to another in the United States; and further, to cause any advertisement of a lottery or similar enterprise to be brought into the United States, or be deposited or carried by the mails, or transferred from one state to another.
 
 
 43
 The case before us does not involve in fact the circulation of advertisements and the question of the abridgment of the freedom of the press; nor does it involve the importation of lottery matter, or its transmission by the mails. It is conceded that the lottery tickets in question, though purporting to be issued by a lottery company of Paraguay, were printed in the United States, and were not imported into the United States from any foreign country.
 
 
 44
 The maked question is whether the prohibition by Congress of the carriage of lottery tickets from one state to another by means other than the mails is within the powers vested in that body by the Constitution of the United States. That the purpose of Congress in this enactment was the suppression of lotteries cannot reasonably be denied. That purpose is avowed in the title of the act, and is its natural and reasonable effect, and by that its validity must be tested. Henderson v. New York, 92 U. S. 268, sub nom. Henderson v. Wickham, 23 L. ed. 548; Minnesota v. Barber, 136 U. S. 320, 34 L. ed. 458, 3 Inters. Com. Rep. 185, 10 Sup. Ct. Rep. 862.
 
 
 45
 The power of the state to impose restraints and burdens on persons and property in conservation and promotion of the public health, good order, and prosperity is a power originally and always belonging to the states, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive, and the suppression of lotteries as a harmful business falls within this power, commonly called, of police. Douglas v. Kentucky, 168 U. S. 488, 42 L. ed. 553, 18 Sup. Ct. Rep. 199.
 
 
 46
 It is urged, however, that because Congress is empowered to regulate commerce between the several states, it, therefore, may suppress lotteries by prohibiting the carriage of lottery matter. Congress may, indeed, make all laws necessary and proper for carrying the powers granted to it into execution, and doubtless an act prohibiting the carriage of lottery matter would be necessary and proper to the execution of a power to suppress lotteries; but that power belongs to the states and not to Congress. To hold that Congress has general police power would be to hold that it may accomplish objects not intrusted to the general government, and to defeat the operation of the 10th Amendment, declaring that 'the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.'
 
 
 47
 The ground on which prior acts forbidding the transmission of lottery matter by the mails was sustained, was that the power vested in Congress to establish postoffices and post roads embraced the regulation of the entire postal system of the country, and that under that power Congress might designate what might be carried in the mails and what excluded. Re Rapier, 143 U. S. 110, 36 L. ed. 93, 12 Sup. Ct. Rep. 374; Exparte Jackson, 96 U. S. 727, 24 L. ed. 877.
 
 
 48
 In the latter case, Mr. Justice Field, delivering the unanimous opinion of the court, said: 'But we do not think that Congress possesses the power to prevent the transportation in other ways, as merchandise, of matter which it excludes from the mails. To give efficiency to its regulations and prevent rival postal systems, it may, perhaps, prohibit the carriage by others for hire, over postal routes, of articles which legitimately constitute mail matter, in the sense in which those terms were used when the Constitution was adopted, consisting of letters, and of newspapers and pamphlets, when not sent as merchandise; but further than this its power of prohibition cannot extend.' And this was repeated in the Case of Rapier.
 
 
 49
 Certainly the act before us cannot stand the test of the rule laid down by Mr. Justice Miller in the Trade-Mark Cases, 100 U. S. 96, sub nom. United States v. Steffens, 25 L. ed. 552, when he said: 'When, therefore, Congress undertakes to enact a law, which can only be valid as a regulation of commerce, it is reasonable to expect to find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several states, or with the Indian tribes. If not so limited, it is in excess of the power of Congress.'
 
 
 50
 But apart from the question of bona fides, this act cannot be brought within the power to regulate commerce among the several states, unless lottery tickets are articles of commerce, and, therefore, when carried across state lines, of interstate commerce; or unless the power to regulate interstate commerce includes the absolute and exclusive power to prohibit the transportation of anything or anybody from one state to another.
 
 
 51
 Mr. Justice Catron remarked in the License Cases [5 How. 504, 600, 12 L. ed. 256, 299] that 'that which does not belong to commerce is within the jurisdiction of the police power of the state; and that which does belong to commerce is within the jurisdiction of the United States;' and the observation has since been repeatedly quoted by this court with approval.
 
 
 52
 In United States v. E. C. Knight Co. 156 U. S. 13, 39 L. ed. 329, 15 Sup. Ct. Rep. 254, we said: 'It is vital that the independence of the commercial power and of the police power, and the delimitation between them, however sometimes perplexing, should always be recognized and observed, for while the one furnishes the strongest bond of union, the other is essential to the preservation of the autonomy of the states as required by our dual form of government; and acknowledged evils, however grave and urgent they may appear to be, had better be borne than the risk be run, in the effort to suppress them, of more serious consequences by resort to expedients of even doubtful constitutionality. It will be perceived how far reaching the proposition is that the power of dealing with a monopoly directly may be exercised by the general government whenever interstate or international commerce may be ultimately affected. The regulation of commerce applies to the subjects of commerce, and not to matters of internal police.' This case was adhered to in Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 44 L. ed. 136, 20 Sup. Ct. Rep. 96, where it was decided that Congress could prohibit the performance of contracts, whose natural effect, when carried out, would be to directly regulate interstate and foreign commerce.
 
 
 53
 It cannot be successfully contended that either Congress or the states can, by their own legislation, enlarge their powers, and the question of the extent and limit of the powers of either is a judicial question under the fundamental law.
 
 
 54
 If a particular article is not the subject of commerce, the determination of Congress that it is, cannot be so conclusive as to exclude judicial inquiry.
 
 
 55
 When Chief Justice Marshall said that commerce embraced intercourse, he added, commercial intercourse, and this was necessarily so since, as Chief Justice Taney pointed out, if intercourse were a word of larger meaning than the word 'commerce,' it could not be substituted for the word of more limited meaning contained in the Constitution.
 
 
 56
 Is the carriage of lottery tickets from one state to another commercial intercourse?
 
 
 57
 The lottery ticket purports to create contractual relations, and to furnish the means of enforcing a contract right.
 
 
 58
 This is true of insurance policies, and both are contingent in their nature. Yet this court has held that the issuing of fire, marine, and life insurance policies, in one state, and sending them to another, to be there delivered to the insured on payment of premium, is not interstate commerce. Paul v. Virginia, 8 Wall. 168, 19 L. ed. 357; Hooper v. California, 155 U. S. 648, 39 L. ed. 297, 5 Inters. Com. Rep. 610, 15 Sup. Ct. Rep. 207; New York L. Ins. Co. v. Cravens, 178 U. S. 389, 44 L. ed. 1,116, 20 Sup. Ct. Rep. 962.
 
 
 59
 In Paul v. Virginia, Mr. Justice Field, in delivering the unanimous opinion of the court, said: 'Inssuing a policy of insurance is not a transaction of commerce. The policies are simple contracts of indemnity against loss by fire, entered into between the corporations and the assured, for a consideration paid by the latter. These contracts are not articles of commerce in any proper meaning of the word. They are not subjects of trade and barter offered in the market as something having an existence and value independent of the parties to them. They are not commodities to be shipped or forwarded from one state to another, and then put up for sale. They are like other personal contracts between parties which are completed by their signature and the transfer of the consideration. Such contracts are not interstate transactions, though the parties may be domiciled in different states. The policies do not take effect—are not executed contracts—until delivered by the agent in Virginia. They are, then, local transactions, and are governed by the local law. They do not constitute a part of the commerce between the states any more than a contract for the purchase and sale of goods in Virginia by a citizen of New York whilst in Virginia would constitute a portion of such commerce.'
 
 
 60
 This language was quoted with approval in Hooper v. California, 155 U. S. 648, 39 L. ed. 297, 5 Inters. Com. Rep. 610, 15 Sup. Ct. Rep. 207, and it was further said: 'If the power to regulate interstate commerce applied to all the incidents to which said commerce might give rise, and to all contracts which might be made in the course of its transaction, that power would embrace the entire sphere of mercantile activity in any way connected with trade between the states, and would exclude state control over many contracts purely domestic in their nature. The business of insurance is not commerce. A contract of insurance is not an instrumentality of commerce. The making of such a contract is a mere incident of commercial intercourse, and in this respect there is no difference whatever between insurance against fire and insurance against 'the perils of the sea." Or, as remarked in New York L. Ins. Co. v. Cravens, 'against the uncertainty of man's mortality.'
 
 
 61
 The fact that the agent of the foreign insurance company negotiated the contract of insurance in the state where the contract was to be finally completed and the policy delivered, did not affect the result. As Mr. Justice Bradley said in the leading case of Robbins v. Shelby County Taxing Dist. 120 U. S. 489, 30 L. ed. 694, 1 inters. Com. Rep. 45, 7 Sup. Ct. Rep. 592: 'The negotiation of sales of goods which are in another state, for the purpose of introducing them into the state in which the negotiation is made, is interstate commerce.' And see Collins v. New Hampshire, 171 U. S. 30, 43 L. ed. 60, 18 Sup. Ct. Rep. 768, and other cases.
 
 
 62
 Tested by the same reasoning, negotiable instruments are not instruments of commerce; bills of lading are, because they stand for the articles included therein; hence it has been held that a state cannot tax interstate bills of lading because that would be a regulation of interstate commerce, and that Congress cannot tax foreign bills of lading, because that would be to tax the articles exported, and in conflict with article 1, § 9, cl. 5, of the Constitution of the United States, that 'no tax or duty shall be laid on any articles exported from any state.' Fairbank v. United States, 181 U. S. 283, 45 L. ed. 862, 21 Sup. Ct. Rep. 648.
 
 
 63
 In Nathan v. Louisiana, 8 How. 73, 12 L. ed. 993, it was held that a broker dealing in foreign bills of exchange was not engaged in commerce, but in supplying an instrumentality of commerce, and that a state tax on all money or exchange brokers was not void as to him as a regulation of commerce.
 
 
 64
 And in Williams v. Fears, 179 U. S. 270, 45 L. ed. 186, 21 Sup. Ct. Rep. 128, that the levy of a tax by the state of Georgia on the occupation of a person engaged in hiring laborers to be employed beyond the limits of the state was not a regulation of interstate commerce, and that the tax fell within the distinction between interstate commerce or an instrumentality thereof, and the mere incidents that might attend the carrying on of such commerce.
 
 
 65
 In Cohens v. Virginia, 6 Wheat. 264, 440, 5 L. ed. 257, 299, Congress had empowered the corporation of the city of Washington to 'authorize the drawing of lotteries for any improvement of the city, which the ordinary funds or revenue thereof will not accomplish.' The corporation had duly provided for such lottery, and this case was a conviction under a statute of Virginia for selling tickets issued by that lottery. That statute forbade the sale within the state of any ticket in a lottery not authorized by the laws of Virginia.
 
 
 66
 The court held, by Chief Justice Marshall, that the lottery was merely the emanation of a corporate power, and 'that the mind of Congress was not directed to any provision for the sale of the tickets beyond the limits of the corporation.'
 
 
 67
 The constitutionality of the act of Congress, as forcing the sale of tickets in Virginia, was therefore not passed on, but if lottery tickets had been deemed articles of commerce, the Virginia statute would have been invalid as a regulation of commerce, and the conviction could hardly have been affirmed, as it was.
 
 
 68
 In Nutting v. Massachusetts, 183 U. S. 553, 556, 46 L. ed. 324, 325, 22 Sup. Ct. Rep. 238, 239, Mr. Justice Gray said: 'A state has the undoubted power to prohibit foreign insurance companies from making contracts of insurance, marine or other, within its limits, except upon such conditions as the state may prescribe, not interfering with interstate commerce. A contract of marine insurance is not an instrumentality of commerce, but a mere incident of commercial intercourse. The state, having the power to impose conditions on the transaction of business by foreign insurance companies within its limits, has the equal right to prohibit the transaction of such business by agents of such companies, or by insurance brokers, who are to some extent the representatives of both parties.'
 
 
 69
 If a state should create a corporation to engage in the business of lotteries, could it enter another state, which prohibited lotteries, on the ground that lottery tickets were the subjects of commerce?
 
 
 70
 On the other hand, could Congress compel a state to admit lottery matter within it, contrary to its own laws?
 
 
 71
 In Alexander v. State, 86 Ga. 246, 10 L. R. A. 859, 12 S. E. 408, it was held that a state statute prohibiting the business of buying and selling what are commonly known as 'futures,' was not protected by the commerce clause of the Constitution, as the business was gambling, and that clause protected interstate commerce, but did not protect interstate gambling. The same view was expressed in State v. Stripling, 113 Ala. 120, 36 L. R. A. 81, 21 So. 409, in respect of an act forbidding the sale of pools on horse races conducted without the state.
 
 
 72
 In Ballock v. State, 73 Md. 1, 8 L. R. A. 671, 20 Atl. 184, 25 Am. St. Rep. 559, it was held that when the bonds of a foreign government are coupled with conditions and stipulations that change their character from an obligation for the payment of a certain sum of money to a species of lottery tickets condemned by the police regulations of the state, the prohibition of their sale did not violate treaty stipulation or constitutional provision. Such bonds with such conditions and stipulations ceased to be vendible under the law.
 
 
 73
 So lottery tickets forbidden to be issued or dealt in by the laws of Texas, the terminus a quo, and by the laws of California or Utah, the terminus ad quem, were not vendible; and for this reason, also, not articles of commerce.
 
 
 74
 If a lottery ticket is not an article of commerce, how can it become so when placed in an envelope or box or other covering, and transported by an express company? To say that the mere carrying of an article which is not an article of commerce in and of itself nevertheless becomes such the moment it is to be transported from one state to another, is to transform a non-commercial article into a commercial one simply because it is transported. I cannot conceive that any such result can properly follow.
 
 
 75
 It would be to say that everything is an article of commerce the moment it is taken to be transported from place to place, and of interstate commerce if from state to state.
 
 
 76
 An invitation to dine, or to take a drive, or a note of introduction, all become articles of commerce under the ruling in this case, by being deposited with an express company for transportation. This in effect breaks down all the differences between that which is, and that which is not, an article of commerce, and the necessary consequence is to take from the states all jurisdiction over the subject so far as interstate communication is concerned. It is a long step in the direction of wiping out all traces of state lines, and the creation of a centralized government.
 
 
 77
 Does the grant to Congress of the power to regulate interstate commerce import the absolute power to prohibit it?
 
 
 78
 It was said in Gibbons v. Ogden that the right of intercourse between state and state was derived from 'those laws whose authority is acknowledged by civilized man throughout the world;' but under the Articles of Confederation the states might have interdicted interstate trade, yet when they surrendered the power to deal with commerce as between themselves to the general government it was undoubtedly in order to form a more perfect union by freeing such commerce from state discrimination, and not to transfer the power of restriction.
 
 
 79
 'But if that power of regulation is absolutely unrestricted as respects interstate commerce, then the very unity the Constitution was framed to secure can be set at naught by a legislative body created by that instrument.' Dooley v. U. S. 183 U. S. 171, 46 L. ed. 136, 22 Sup. Ct. Rep. 70.
 
 
 80
 It will not do to say—a suggestion which has heretofore been made in this case—that state laws have been found to be ineffective for the suppression of lotteries, and therefore Congress should interfere. The scope of the commerce clause of the Constitution cannot be enlarged because of present views of public interest.
 
 
 81
 In countries whose fundamental law is flexible it may be that the homely maxim, 'to ease the shoe where it pinches.' may be applied, but under the Constitution of the United States it cannot be availed of to justify action by Congress or by the courts.
 
 
 82
 The Constitution gives no countenance to the theory that Congress is vested with the full powers of the British Parliament, and that, although subject to constitutional limitations, it is the sole judge of their extent and application; and the decisions of this court from the beginning have been to the contrary.
 
 
 83
 'To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?' asked Marshall, in Marbury v. Madison [1 Cranch, 176, 2 L. ed. 73].
 
 
 84
 'Should Congress,' said the same great magistrate in McCulloch v. Maryland, 'under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government, it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land.' And so Chief Justice Taney, referring to the extent and limits of the powers of Congress: 'As the Constitution itself does not draw the line, the question is necessarily one for judicial decision, and depending altogether upon the words of the Constitution.' [License Cases, 5 How. 574, 12 L. ed. 288.]
 
 
 85
 It is argued that the power to regulate commerce among the several states is the same as the power to regulate commerce with foreign nations, and with the Indian tribes. But is its scope the same?
 
 
 86
 As in effect before observed, the power to regulate commerce with foreign nations and the power to regulate interstate commerce, are to be taken diverso intuitu, for the latter was intended to secure equality and freedom in commercial intercourse as between the states, not to permit the creation of impediments to such intercourse; while the former clothed Congress with that power over international commerce, pertaining to a sovereign nation in its intercourse with foreign nations, and subject, generally speaking, to no implied or reserved power in the states. The laws which would be necessary and proper in the one case would not be necessary or proper in the other.
 
 
 87
 Congress is forbidden to lay any tax or duty on articles exported from any state, and while that has been applied to exports to a foreign country, it seems to me that it was plainly intended to apply to interstate exportation as well; Congress is forbidden to give preference by any regulation of commerce or revenue to the ports of one state over those of another; and duties, imposts, and excises must be uniform throughout the United States.
 
 
 88
 'The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.' This clause of the 2d section of article 4 was taken from the 4th article of Confederation which provided that 'the free inhabitant of each of these states . . . shall be entitled to all privileges and immunities of free citizens in the several states; and the people of each state shall have free ingress and regress to and from any other state, and shall enjoy therein all the privileges of trade and commerce;' while other parts of the same article were also brought forward in article 4 of the Constitution.
 
 
 89
 Mr. Justice Miller, in the Slaughter-House Cases, 16 Wall. 36, 75, 21 L. ed. 394, 408, says that there can be but little question that the purpose of the 4th article of the Confederation, and of this particular clause of the Constitution, 'is the same, and that the privileges and immunities intended are the same in each.'
 
 
 90
 Thus it is seen that the right of passage of persons and property from one state to another cannot be prohibited by Congress. But that does not challenge the legislative power of a sovereign nation to exclude foreign persons or commodities, or place an embargo, perhaps not permanent, upon foreign ships or manufactures.
 
 
 91
 The power to prohibit the transportation of diseased animals and infected goods over railroads or on steamboats is an entirely different thing, for they would be in themselves injurious to the transaction of interstate commerce, and, moreover, are essentially commercial in their nature. And the exclusion of diseased persons rests on different ground, for nobody would pretend that persons could be kept off the trains because they were going from one state to another to engage in the lottery business. However enticing that business may be, we do not understand these pieces of paper themselves can communicate bad principles by contact.
 
 
 92
 The same view must be taken as to commerce with Indian tribes. There is no reservation of police powers or any other to a foreign nation or to an Indian tribe, and the scope of the power is not the same as that over interstate commerce.
 
 
 93
 In United States v. 43 Gallons of Whiskey, 93 U. S. 188, 194, sub nom. United States v. Lariviere, 23 L. ed. 846, 847, Mr. Justice Davis said: 'Congress now has the exclusive and absolute power to regulate commerce with the Indian tribes,—a power as broad and free from restrictions as that to regulate commerce with foreign nations. The only efficient way of dealing with the Indian tribes was to place them under the protection of the general government. Their peculiar habits and character required this; and the history of the country shows the necessity of keeping them 'separate, subordinate, and dependent.' Accordingly, treaties have been made and laws passed separating Indian territory from that of the states, and providing that intercourse and trade with the Indians should be carried on solely under the authority of the United States.'
 
 
 94
 I regard this decision as inconsistent with the views of the framers of the Constitution, and of Marshall, its great expounder. Our form of government may remain notwithstanding legislation or decision, but, as long ago observed, it is with governments, as with religions: the form may survive the substance of the faith.
 
 
 95
 In my opinion the act in question in the particular under consideration is invalid, and the judgments below ought to be reversed, and my brothers Brewer, Shiras and Peckham concur in this dissent.