**NATIONAL ASSOCIATION OF MOTOR BUS OWNERS et al., Appellants,**

v.

**Claude S. BRINEGAR, Secretary of the Department of Transportation.**

**No. 71-1268.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 22, 1972.

Decided July 26, 1973.

Rehearing Denied Aug. 22, 1973.

22. *See* 114 Cong.Rec. 25060–62 (1968) (debate concerning amendment offered by Rep. Blatnik).

Robert J. Corber, Arlington, Va., for appellant National Association of Motor Bus Owners, et al.

Francis A. Silver, Arlington, Va., for appellant American Transit Ass'n, Milwaukee & Suburban Transport Corp., and the City Transit Co.

Peter T. Beardsley and Richard A. Mehley were on the brief for appellant American Trucking Associations, Inc.

Joseph B. Scott, Atty., Dept. of Justice, for appellee. L. Patrick Gray, III, Asst. Atty. Gen. at the time the brief was filed, Thomas A. Flannery, U. S. Atty. at the time the brief was filed, Alan S. Rosenthal and Judith S. Ziss, Attys., Dept. of Justice, were on the brief for appellee.

Before WADE H. McCREE, Jr.,[*] Circuit Judge for the Sixth Circuit, and ROBINSON and ROBB, Circuit Judges.

ROBB, Circuit Judge:

In this action for declaratory judgment and injunctive relief the appellants challenge regulations promulgated by the Secretary of Transportation and the Acting Administrator of the Federal Highway Administration. The regulations, issued under section 204 of the Traffic and Motor Vehicle Safety Act of 1966[1] (80 Stat. 729, 15 U.S.C. § 1424 (1970)) govern the sale and use of regrooved tires.[2] The complaint alleges that the regulations are (a) beyond the authority of the Administrator, (b) vague, uncertain and ambiguous, and (c) arbitrary, unreasonable and an abuse of discretion. On cross motions for summary judgment the District Court rejected these contentions and entered a judgment for the defendants.

Appellant National Association of Motor Bus Owners (NAMBO) is the national trade organization for the intercity bus industry. Its members engage in the transportation of persons and property in interstate commerce by motor vehicles pursuant to authority issued by the Interstate Commerce Commission under the Interstate Commerce Act.

Appellant American Trucking Associations, Inc. (ATA), an intervenor in the District Court, is the national organization of the trucking industry. It is an affiliation of fifty-one state trucking associations whose members consist of for-hire and private motor carriers. Most of the for-hire carriers operate pursuant to authority issued by the Interstate Commerce Commission.

The appellants American Transit Association (Transit), Milwaukee & Suburban Transport Corp. (Suburban), and City Transit Company (City Transit), also intervened in the District Court. Transit is a national voluntary trade association for the local transit industry.

City Transit operates motor buses exclusively in the intrastate transportation of passengers within and around the city of Dayton, Ohio, and in charter operations wholly within the state of Ohio and by local authorities in Ohio. City Transit purchases tire mileage from the B. F. Goodrich Company pursuant to a contract under which an employee of Goodrich, working in City Transit's garages, regrooves tires used by City Transit.

Suburban operates motor buses exclusively in the intrastate transportation of passengers for compensation in Milwaukee, Wisconsin, and adjacent areas. It conducts its business under a Common Motor Carrier Certificate issued by the Public Service Commission of Wisconsin. The company regrooves its own bus tires for use on its own buses operating wholly in intrastate commerce within the state of Wisconsin.

I.

In order that the challenged regulations and the contentions of the parties may be viewed in focus a summary of the relevant parts of the statute and their legislative history is necessary.

On October 19, 1965, a tire safety bill was introduced in the Senate (S. 2669, 89th Cong., 2d Sess.). When reported out of committee as the "Tire Safety

---

* Sitting by designation pursuant to Title 28, U.S.C. § 291(a) (1970).

1. References in this opinion to particular provisions of the Traffic and Motor Vehicle Safety Act are made according to those found in the original Act, cited in Pub.L. 89-563, Title II, § 204, Sept. 9, 1966, 80 Stat. 718.

2. Section 204(c) of the Act (15 U.S.C. § 1424(c) (1970)), defines a regrooved tire as "a tire on which a new tread has been produced by cutting into the tread of a worn tire."

Act of 1966" this bill provided, with respect to regrooved tires:

No person, firm, or corporation shall sell, offer for sale, or introduce for sale or deliver for introduction in interstate commerce any tire or motor vehicle equipped with any tire which has been regrooved, except that the Secretary may by order permit the sale of regrooved tires or motor vehicles equipped with such tires which he finds are designed and constructed in a manner consistent with the purposes of this Act. S.Rep. No. 1089, 89th Cong., 2d Sess. 45 (1966).

The bill also, among other things, required the Secretary [3] to promulgate minimum safety performance standards, maximum permissible load standards, and labeling requirements for tires, and to investigate the feasibility of grading requirements. (S.Rep. No. 1089, 89th Cong., 2d Sess. 33–36, 40 (1966)). In the bill, "motor vehicle" was defined to mean "passenger cars and station wagons" other than certain special purpose vehicles such as racing cars. (*Id.* at 33). According to the Senate Commerce Committee, the regrooved tire provision was inserted into the bill because:

[T]he committee concluded that the practice of regrooving passenger car tires, in which an iron or tread design device is used to cut into the undertread of a smooth tire carcass to produce a new tread design—a universally condemned practice—should be prohibited by this bill. However, the Secretary would be given the authority to permit the regrooving of any tires which he finds are designed and constructed so as to permit safe regrooving. S.Rep. No. 1089, 89th Cong., 2d Sess. 5 (1966).

The tire safety bill was enacted by the Senate with the regrooved tire provision unchanged (112 Cong.Rec. 6925 (1966)). But neither this bill nor a tire safety bill introduced in the House of Representatives which contained a similar prohibition (H.R. 1366, 89th Cong., 2d Sess. (1966)) ever reached the House floor.

During the same session a traffic safety bill, a more comprehensive measure than the tire safety bills, was also before each House. The Senate version (S. 3005) authorized the promulgation of "motor vehicle safety standards" for "motor vehicles and motor vehicle equipment". (S.Rep. No. 1301, 89th Cong., 2d Sess. 25 (1966). The bill, which made no separate provision for tires, defined "motor vehicle" to mean:

[A]ny vehicle driven or drawn by mechanical power primarily for use on the public roads, streets, and highways, other than (1) a vehicle subject to safety regulations under part II of the Interstate Commerce Act, as amended (49 U.S.C. 301 *et seq.*), or under the Transportation of Explosives Act as amended (18 U.S.C. 831–835), and (2) a vehicle or car operated exclusively on a rail or rails. S. Rep. No. 1301, 89th Cong., 2d Sess. 24 (1966).

The bill was passed by the Senate without substantial change. (112 Cong.Rec. 14256 (1966)).

The traffic safety bill on the House side (H.R. 13228) differed in certain respects from the Senate provision. First, it contained a separate title on tire safety, designated as Title II. This title provided that standards promulgated in Title I (which, as in the Senate bill, dealt generally with vehicle and equipment safety standards) require that tires be properly labeled and, further, that all new cars be equipped with tires which are adequate when the vehicle is fully loaded. The Secretary was also di-

---

3. The bill, as introduced and later enacted, vested the administrative functions in the Secretary of Commerce. These duties were thereafter transferred to the Secretary of Transportation (49 U.S.C. 1655 (a) (6) (A)) who, in turn, delegated his authority to the Federal Highway Administrator, 49 C.F.R. § 1.4(c)(3)(1) (1970), and later, to the Director of the National Highway Safety Bureau, 49 C.F.R. § 151 (1971). The authority now rests in the National Highway Traffic Safety Administrator pursuant to 49 C.F.R. § 1.51(a) (1972).

rected to establish a tire grading system (H.Rep. No. 1776, 89th Cong., 2d Sess. 9 (1966)). The tire safety title did not deal specifically with regrooved tires.

The House Committee on Interstate and Foreign Commerce explained the need for a separate title pertaining to tires:

> In a number of bills which have been introduced in both Houses as well as in a bill which has passed the Senate (S. 2669) the necessity for standards for tires was considered as an independent problem and without reference to its relationship to the total traffic safety problem. S. 2669 is confined only to the improvement of tires for passenger cars and station wagons. The committee decided that although tires are a highly important part of the total traffic safety problem they are, nevertheless, an integral part of it and should be dealt with in the context of the total problem and not in a piecemeal fashion. Therefore it is neither necessary nor desirable to grant separate authority for the establishment of standards for this one item of motor vehicle equipment when the Secretary has full authority to issue standards as to tires (as well as any other item of motor vehicle equipment) under title I of the reported bill. However, the committee did feel that it was necessary to emphasize this aspect of the safety problem and to establish certain specific requirements which should be contained in the Secretary's standards on tires. These requirements are set forth in section 201, and deal only with information to be given to consumers. The Secretary's authority to establish standards as to tire performance is contained in title I, and in establishing these standards he will have to consider distinctions between new tires and retreads. H.Rep. No. 1776, 89th Cong., 2d Sess. 32 (1966).

The house bill also contained a broader definition of "motor vehicle" than the Senate bill. Specifically, section 102(3) defined "motor vehicle" as:

> . . . any vehicle driven or drawn by mechanical power manufactured primarily for use on the public streets, roads, and highways, except any vehicle operated exclusively on a rail or rails. H.Rep. No. 1776, 89th Cong., 2d Sess. 2 (1966).

According to the Committee, the exemption was removed for vehicles subject to part II of the Interstate Commerce Act or the Transportation of Explosives Act because "[t]here appeared to be no way to determine with any certainty which vehicles would be subject to the standards and which would be exempt". (H. Rep. No. 1776, 89th Cong., 2d Sess. 15 (1966)). However, to avoid conflicting regulations the Committee inserted as section 103(g) of Title I:

> . . . a requirement that in prescribing safety regulations the Interstate Commerce Commission will not adopt or continue in effect any regulation on safety which is different from a safety standard issued under this title. The Interstate Commerce Commission, however, after manufacture, can impose a higher standard of safety performance on a motor vehicle subject to this jurisdiction. H.Rep. No. 1776, 89th Cong., 2d Sess. 16 (1966).

This bill was passed by the House with these provisions substantially intact. (112 Cong.Rec. 19673 (1966)).

The Senate then requested a conference. (112 Cong.Rec. 19863 (1966)). Senator Magnuson, Chairman of the Senate Commerce Committee, explained on the floor why a conference was required:

> In clarifying the scope of truck standards, in spelling out detailed requirements for tire safety standards * * *, the House Amendments represent constructive effort greatly in the public interest.
>
> There are, however, several desirable features in the Senate bill which are not fully reflected in the House

version. \* \* \* [E.g.], [t]he desirability of prohibiting tire regrooving. . . .[4] 112 Cong.Rec. 19862–63 (1966).

In conference Title II of the House bill, the tire title, was expanded to include, among other things, a regrooved tire prohibition almost identical with the one contained in the original Senate tire bill (H.Rep. No. 1919, 89th Cong., 2d Sess. 12, 13 (1966)). The broad definition of "motor vehicle", contained in Title I of the House bill, was retained. (*Id.* at 2). Senator Magnuson, in submitting the conference report to the Senate, said:

> The House Members accepted \* \* \* the prohibition—taken from the Senate tire bill—against the regrooving of tires. 112 Cong.Rec. 21487 (1966).

Reporting to the House, Mr. Staggers stated:

> The House definition [of motor vehicle] covers all vehicles, including trucks and buses. The definition in the Senate version was more restrictive and was interpreted as not including trucks and buses. The managers for the Senate receded. 112 Cong.Rec. 21349 (1966).

The bill, as amended in conference, was enacted by both houses as the Traffic and Motor Vehicle Safety Act of 1966. (112 Cong.Rec. 21353, 21492; Pub.L. 89–563, Sept. 9, 1966, 80 Stat. 718–730).

## II.

Title I of the Act is captioned "Motor Vehicle Safety Standards". A motor vehicle safety standard is defined by section 102(2) as "a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." (15 U.S.C. § 1391(2)). Section 102(4) (15 U.S.C. § 1391(4)) provides that " 'Motor vehicle equipment' means any system, part, or component of a motor vehicle as originally manufactured or any similar part or component manufactured or sold for replacement or improvement of such system, part, or component or as any accessory, or addition to the motor vehicle. . . ."

Section 103(a) (15 U.S.C. § 1392(a)) directs the Secretary to "establish by order" standards as defined in section 102(2). Section 103(b) (15 U.S.C. § 1392(b)) specifies that the "Administrative Procedure Act shall apply to all orders establishing, amending, or revoking a Federal motor vehicle safety standard *under this title*." (Emphasis added). Section 103(f) directs that in prescribing standards the Secretary shall consider relevant available motor vehicle safety data, consult with the Vehicle Equipment Safety Commission and other agencies and "consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed; and . . . consider the extent to which such standards will contribute to carrying out the purposes of this Act." (15 U.S.C. § 1392(f)).

Section 108(a)(1) (15 U.S.C. § 1397(a)) provides that "No person shall —(1) manufacture for sale, sell, offer for sale, or introduce or deliver for introduction in interstate commerce, or import into the United States, any motor vehicle or item of motor vehicle equipment manufactured on or after the date any applicable Federal motor vehicle safety standard takes effect *under this title* unless it is in conformity with such standard except as provided in subsection (b) of this section. . . ." (Emphasis added). Section 108(b)(1) stipulates that the prohibition of section 108(a)(1) "shall not apply to the sale, the offer for sale, or the introduction or delivery for introduction in interstate commerce of any motor vehicle or motor vehicle equipment after the first pur-

---

4. Here, Senator Magnuson apparently was referring to the Senate tire bill rather than to the comprehensive traffic safety bill being debated.

chase of it in good faith for purposes other than resale. . . ." (15 U.S.C. § 1397(b)(1)).

Section 109(a) (15 U.S.C. § 1398(a)) authorizes the imposition of a civil penalty not exceeding $1,000 for each violation of any provision of section 108 or any regulation issued thereunder, except that the maximum penalty for any related series of violations shall not exceed $400,000.

Section 110(a) confers jurisdiction on United States District Courts "to restrain violations of this title, or to restrain the sale, offer for sale, or the introduction or delivery for introduction, in interstate commerce, or the importation into the United States, of any motor vehicle or item of motor vehicle equipment which is determined, prior to the first purchase of such vehicle in good faith for purposes other than resale, not to conform to applicable Federal motor vehicle safety standards prescribed *pursuant to this title* . . . ." (15 U.S.C. § 1399(a)) (Emphasis added). Section 119 (15 U.S.C. § 1407) authorizes the Secretary "to issue, amend, and revoke such rules and regulations as he deems necessary *to carry out this title.*" (Emphasis added).

Title II of the Act is captioned "Tire Safety". Section 201 (15 U.S.C. § 1421) of this Title directs that "In all standards for pneumatic tires established *under title I of this Act*, the Secretary shall require that tires subject thereto" be labeled with certain specified safety information. (Emphasis added). Section 202 provides: "In standards established *under title I of this Act* the Secretary shall require that each motor vehicle be equipped by the manufacturer or by the purchaser thereof at the time of the first purchase thereof in good faith for purposes other than resale with tires which meet the maximum permissible load standards when such vehi-

cle is fully loaded with the maximum number of passengers it is designed to carry and a reasonable amount of luggage." (15 U.S.C. § 1422) (Emphasis added). Section 203 directs the Secretary "through standards established *under title I of this Act*" to prescribe by order and publish in the Federal Register a uniform quality grading system for motor vehicle tires. (15 U.S.C. § 1423) (Emphasis added).

Section 204(a) and (b) (15 U.S.C. § 1424(a) and (b)) provide:

(a) No person shall sell, offer for sale, or introduce for sale or deliver for introduction in interstate commerce, any tire or motor vehicle equipped with any tire which has been regrooved, except that the Secretary may by order permit the sale of regrooved tires and motor vehicles equipped with regrooved tires which he finds are designed and constructed in a manner consistent with the purposes of this Act.

(b) Violations of this section shall be subject to civil penalties and injunction in accordance with sections 109 and 110 of this Act.

Section 206 (15 U.S.C. § 1426, 84 Stat. 263) directs the Secretary to establish "safety standards *under title I*" for tire carcasses which can be retreaded. (Emphasis added).

Purporting to act pursuant to the authority of sections 204(a) and 119[5] of the Act (15 U.S.C. §§ 1424(a), 1407) the Administrator published a Notice of Proposed Rulemaking to establish "criteria to govern the use of regrooved tires." (33 Fed.Reg. 8603 (1968)). Interested persons were invited to participate in the making of the proposed regulations by submitting data, views or arguments.[6] Thereafter the regulations were published (34 Fed.Reg. 1149, 1150 (1969)) and became effective April 1, 1969. (34 Fed.Reg. 3687, 3688 (1969)).

---

5. The Administrator's rulemaking must stand on the authority granted in section 204(a) since section 119, the "necessary rules and regulations" clause, is by its very terms not applicable to the tire safety title of the Act.

6. The appellants were among those submitting comments and arguments.

They now appear at 49 C.F.R. § 569.1, *et seq.* (1972).

The regulations challenged by appellants are:

(a) Regrooved Tires: No person shall sell, offer for sale, or introduce for sale or deliver for introduction into interstate commerce regrooved tires produced by removing rubber from the surface of a worn tire tread to generate a new tread pattern unless the tires conform to [certain specified requirements].

\* \* \* \* \* \*

(b) Any person who regrooves tires and leases them to owners or operators of motor vehicles and any person who regrooves his own tires for use on motor vehicles is considered to be a person delivering for introduction into interstate commerce within the meaning of this part. 49 C.F.R. § 569.7.

### III.

The appellants, in their brief, attack the regulations on several grounds. (1) They say that the Act contemplates the issuance of Motor Vehicle Safety Standards, taking into account the factors and considerations specified in section 103 of Title I, and that accordingly, the Secretary should have promulgated such standards for regrooved tires, instead of issuing a regulation under section 204 in Title II. Noting that the Secretary may proceed under section 204 "by order" they argue that the "only provision in the Act for orders is section 103 [of Title I] which authorizes the Administrator to issue Federal standards 'by order'". (2) Contending that the Act applies only to manufacturers, distributors and dealers and not to consumers such as themselves, they invoke the "first purchase" exemptions appearing or implicit in sections 108(b), 109 and 110. (3) They argue that section 204 does not apply to carriers subject to regulation under the Interstate Commerce Act. (4) They say that motor carriers who regroove their own tires and use them on their own vehicles do not "deliver" them for introduction in interstate commerce. (5) Finally, Suburban and City Transit contend that since they operate wholly in intrastate commerce they are not subject to regulation under the Act. We are not persuaded by any of these arguments.

■ We think the authority of the Secretary under section 204(a) of Title II is independent of his authority to establish safety standards under section 103 of Title I. Section 103 by its terms applies only to orders establishing standards under Title I. Section 204(a) does not in terms refer to Title I, but the other operative sections of Title II are specifically keyed to "standards established under title I." (Sections 201, 202, 203, 206; 15 U.S.C. §§ 1421, 1422, 1423, 1426). Standards under section 103 must be "practicable \* \* \* meet the need for motor vehicle safety, \* \* \* and stated in objective terms." On the other hand section 204(a) sets up its own standards for regrooved tires: their sale may be permitted only if they are "designed and constructed in a manner consistent with the purposes of this Act." Those purposes are "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." (Section 1; 15 U.S.C. § 1381). Thus, even though the requirements of section 204(a) are not "practicable"—that is, even though it is not "practicable" to produce a regrooved tire that meets those requirements—the use of regrooved tires is still prohibited.

■ The appellants argue that they are immune from regulation under section 204 because they are subject to safety regulations promulgated under the Interstate Commerce Act. (49 U.S.C. § 301 *et seq.*). In support of their argument the appellants point to section 205 of the Safety Act which provides that in the event of conflict between the requirements of orders or regulations issued by the Administrator, applicable to tires, and orders issued by the Federal Trade Commission, the provisions of orders or regulations by the Administrator

1302

shall prevail. The appellants contend that since no provision was made for conflicts between the Administrator and the Interstate Commerce Commission, we must conclude that Congress did not intend section 204 to apply to carriers subject to regulation under the Interstate Commerce Act. Congress thought no conflict could arise, say the appellants, because it was not intended that section 204 should apply to carriers subject to regulation under the Interstate Commerce Act. We cannot accept the inference drawn by the appellants. Section 204 applies to "any tire or motor vehicle equipped with any tire which has been regrooved. . . ." As we have seen, the conference version of the bill, which was finally enacted, expanded the definition of motor vehicle to include "all vehicles, including trucks and buses". Moreover, since bus and truck operators are major users of regrooved tires it would be unreasonable to conclude that Congress intended to exempt them from the prohibition of section 204. We note also that the appellants do not claim that any conflicts in the regulations now exist; and we think the likelihood of conflicts is remote since both the Motor Vehicle Safety Act and section 204 of the Interstate Commerce Act (49 U.S.C. § 304) are now administered by the Department of Transportation. See 49 U.S.C. § 1655(e)(6)(C).

The appellants contend that by regrooving their own tires and using them on their own vehicles they do not "deliver" the tires for introduction within the meaning of section 204. They invoke the dictionary definition of "deliver" as meaning to give, transfer; yield possession or control of; make or hand over; send to an intended destination. From this they argue that a person cannot make a delivery to himself and that "delivery for introduction" must mean delivery by a manufacturer, wholesaler, or dealer to a wholesaler, dealer, or user pursuant to a sale. If the appellants' argument is correct, then the word "deliver" in section 204 is unnecessary, for such transactions by a manufacturer,

wholesaler or dealer would be covered by the word "sale". We hold, however, that the word "deliver" in the context of the statute cannot be so narrowly and legalistically construed, and that, in using the word, Congress was referring not to a transfer of legal possession or control, but to any physical transfer or movement of a regrooved tire for the purpose of introducing it in interstate commerce. A person who regrooves his own tires and thereafter moves them to his garage or terminal for use on motor vehicles is therefore within the intendment of the statute, and subject to regulation thereunder.

The "first purchase" exception upon which the appellants rely appears in two sections of Title I. Section 108(b)(1) exempts from the prohibitions of section 108(a)(1) a purchaser in good faith for purposes other than resale. A similar provision in section 110(a) exempts a first purchaser from the injunctive jurisdiction of the district courts. The appellants argue that since they buy their tires "for purposes other than resale" they are exempted from the coverage of the Act. We do not agree.

Both section 108(b)(1) and section 110(a), which appear in Title I of the Act, refer and are keyed to violations or other sections of that title. They do not relate to violations of Title II, in which section 204 appears, and we find nothing to indicate that Congress intended the first purchase exception to be carried over to section 204. We are fortified in this conclusion by the obvious purpose of Congress in enacting section 204, which was to prohibit the use of regrooved tires in interstate commerce, whether that use was by the first purchaser or by anyone else.

Appellants advance the theory that the "first purchase" exception is applicable to regrooved tires because section 204(b) provides that "violations of this section shall be subject to civil penalties and injunction in accordance with sections 109 and 110 of this Act." Section 109 stipulates the civil penalties

that may be levied for violations of section 108, which contains the "first purchase" exception. Section 110 is a dual grant of jurisdiction to the district courts (1) to restrain violations of Title I, or (2) to restrain "the sale, offer for sale, or introduction or delivery for introduction" of motor vehicles or motor vehicle equipment prior to first purchase and not conforming "to applicable Federal motor vehicle standards prescribed pursuant to this title. . . ." This second grant, containing the first purchase exception, is predicated upon the applicable motor vehicle standards issued under section 103 and is not keyed to section 204. However, the first grant, permitting injunctive relief against statutory violations, is readily transferable to section 204 and conveys equitable jurisdiction over violations of section 204(a). We think that the reference in section 204(b) to sections 109 and 110 is merely an indication of the procedure and penalties available for the enforcement of section 204(a); it is not a limitation on the sweep of section 204(a).

## IV.

The contentions of Suburban and City Transit present more difficulty. By affidavits filed in the District Court and not traversed by the Administrator on the motion for summary judgment, they assert that they operate motor buses exclusively in the intrastate transportation of passengers. They contend that since their operations are not in interstate commerce they do not come within the scope of the Act. The Administrator responds that the roads upon which the buses of the two companies travel "are within the stream of interstate commerce", that the buses "intermingle with interstate traffic" and that a defective tire on such a bus could interfere with traffic in interstate commerce. Accordingly, says the Administrator, he "was plainly justified in determining that a person who places a tire on a bus which will travel on such a road has placed it in 'interstate commerce' ".

In substance the Administrator's argument is that his regulation is justified because a defective tire on a bus operating in intrastate commerce may affect interstate commerce. The flaw that I find in the Administrator's argument is that the statute (Section 102(9); 15 U.S.C. § 1391(9)) defines "interstate commerce" as "commerce between any place in a State and any place in another State, or between places in the same State through another State." On its face the statute does not relate to activities which merely affect interstate commerce, and I think it cannot be so broadly construed. Had Congress intended to include such activities in its definition it would have said so. *Cf.* Texas International Airlines v. CAB, 154 U.S.App.D.C. 113, 473 F.2d 1150 (1972).[7]

Although I am not impressed by the Administrator's response to the argument of the intrastate bus companies I think his regulation may be sustained on another ground. Interstate commerce "is an intensely practical concept drawn from the normal and accepted course of business". United States v. Yellow Cab Co., 332 U.S. 218, 231, 67 S.Ct. 1560, 1567, 91 L.Ed. 2010 (1947). As a practical matter I think it not an irrational conclusion that any bus, even though presently engaged in intrastate transportation, is likely at some time to cross state lines. A bus may be driven across state lines without authority of its owner, or it may be chartered, leased or sold for use in transporting persons across state lines. In short, it is not unreasonable to conclude that a bus and its tires may travel beyond the bounds of its usual habitat. Thus, although a bus tire may never in fact have crossed a state line it would nevertheless be subject to the proscription of the Act because the

---

7. The proscription against regrooved tires contained in section 204(a) is not against their mere "introduction" in interstate commerce. The language that Congress used prohibited (in interstate commerce) the sale, offer for sale, introduction for sale, and the delivery for introduction of regrooved tires.

Administrator has rationally presumed, as a matter of law, that the tire will travel interstate at some future date. If this were not so, and the prohibition of section 204 were unenforceable against the owner of any buses normally operated in intrastate commerce, the statute would be substantially ineffectual.

## V.

■ Having rejected the appellants' many challenges to the regulations we turn finally to one specific flaw which we believe invalidates them in part. Section 204 allows the Administrator to permit only the sale of regrooved tires. This is the position of the appellants in their brief, and was conceded by the government at oral argument. Yet, the Administrator's regulation purports to authorize not only the sale of regrooved tires but also their delivery for introduction into interstate commerce. We are constrained to conclude that in permitting more than the sale of regrooved tires the Administrator's regulation exceeds his authority, and the District Court should have held it to be invalid. If the statute is to this extent defective Congress may amend it, but it is not for us to do so. "It is not for us * * * to try to avoid the conclusion that Congress did not mean what it said. Argu-

ments of policy are relevant when for example a statute has an hiatus that must be filled or there are ambiguities in the legislative language that must be resolved. But when Congress, though perhaps mistakenly or inadvertently, has used language which plainly brings a subject matter into a statute, its word is final—save for questions of constitutional power which have not even been intimated here." Unexcelled Chemical Corp. v. United States, 345 U.S. 59, 64, 73 S.Ct. 580, 583, 97 L.Ed. 821 (1953). In this respect therefore the judgment of the District Court is reversed; in all other respects it is affirmed.

It is so ordered.

ROBINSON, Circuit Judge, with whom McCREE, Circuit Judge, joins in Parts I–III, concurring in part and dissenting in part:

Save for one aspect, I join in the court's disposition of this appeal [1] and, save for that aspect and another, in Judge Robb's opinion for the court. My first disagreement relates to the basis upon which it is concluded that urban and suburban transit systems, as intrastate carriers, are subject to the restrictions on regrooved tires [2] imposed by Section 204(a) of the Act [3] and its im-

---

[1]. The Act provides for judicial review in the courts of appeals of orders establishing motor vehicle safety standards "under section 103 [15 U.S.C. § 1392 (1970)] . . . ." National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89–563, tit. I, § 105(a)(1), 80 Stat. 720 (1966), 15 U.S.C. § 1394(a)(1) (1970). We have held that nonstatutory remedies are available to enable review of § 103 orders only in very special and limited circumstances. Nader v. Volpe, 151 U.S. App.D.C. 90, 466 F.2d 261 (1972). However, the record makes it clear that in fashioning the regulations under attack the Secretary did not purport to act pursuant to § 103; and as the court now holds, see ante pp. 1301, 1302–1303, those regulations were promulgated, not under § 103, but rather under § 204(a), 15 U.S.C. § 1424 (1970). Since the Act does not specify any method for reviewing action taken pursuant to § 204(a), it fol-

lows, despite the apparent anomaly, that the District Court had jurisdiction to entertain appellants' challenge. Administrative Procedure Act § 10(b), 60 Stat. 243 (1946), as amended, 5 U.S.C. § 703 (1970). Compare Abbott Laboratories v. Gardner, 387 U.S. 136, 139–148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Independent Broker-Dealers' Trade Ass'n v. SEC, 142 U.S.App.D.C. 384, 389–395, 442 F.2d 132, 137–143, cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971); Elmo Div. of Drive-X Co. v. Dixon, 121 U.S.App.D.C. 113, 115, 116, 348 F.2d 342, 344, 345 (1965).

[2]. *Ante* pp. 1302–1304.

[3]. "No person shall sell, offer for sale, or introduce for sale or deliver for introduction in interstate commerce, any tire or motor vehicle equipped with any tire which has been regrooved, except that the Secretary may by order permit the sale of

plementing administrative regulations.[4] I subscribe wholeheartedly to that conclusion, but for reasons which differ fundamentally from Judge Robb's rationale.[5] My second disaccord is with the holding that the exemption clause of Section 204(a)[6] does not authorize the Secretary of Transportation to allow deliveries of regrooved tires for introduction into interstate commerce when he finds that the tires have been designed and constructed consistently with the purposes of the Act.[7] In my view the exemption clause, properly construed, confers that power, and the Secretary's regulation exercising it [8] is valid.[9]

## I

The great majority of the Transit systems complaining of the proscriptions on use of regrooved tires [10] are engaged exclusively in the transportation of passengers wholly within the territorial limits of a single state. If their operations are neatly covered by the Act at all, it is because of the prohibition in Section 204(a) on "deliver[y] for introduction in interstate commerce" of "any tire or motor vehicle equipped with any tire which has been regrooved. . . ." [11] As the court holds, there is a "deliver[y]" when there is a physical movement toward introduction into commerce,[12] and the record demonstrates that transit systems mount and use regrooved tires on their buses.[13] The only question remaining, then, is whether "the intrastate runs made by these buses constitute an introduction in interstate commerce." [14]

The Act defines "interstate commerce" as "commerce between any place in a State and any place in another State, or between places in the same State through another State." [15] While that definition is in terms supplied for the Act's Title I provisions,[16] surely as

regrooved tires and motor vehicles equipped with regrooved tires which he finds are designed and constructed in a manner consistent with the purposes of this chapter." National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89–563, tit. II, § 204(a), 80 Stat. 729 (1966), 15 U.S.C. § 1424(a) (1970).

4. Regrooved Tire Regulations, 49 C.F.R. §§ 569.1 et seq. (1972). Two provisions of § 569.7 of the regulations are particularly involved. One is § 569.7(a) providing that "[n]o person shall sell, offer for sale, or introduce for sale or deliver for introduction into interstate commerce regrooved tires produced by removing rubber from the surface of a worn tire tread to generate a new tread pattern unless the tires conform to" specified requirements. The other provision is § 569.7(b) providing that "[a]ny person who regrooves tires and leases them to owners or operators of motor vehicles and any person who regrooves his own tires for use on motor vehicles is considered to be a person delivering for introduction into interstate commerce within the meaning of" the regulations.

5. Parts I–III, *infra.*

6. See note 3, *supra.*

7. *Ante* p. 1304.

8. See note 4, *supra.*

9. Part IV, *infra.*

10. The parties complaining here are the American Transit Association, functioning as the national organization for the local transit industry in the United States, composed of more than 200 companies operating motor buses in 40-odd states and the District of Columbia; Milwaukee and Suburban Transportation Corporation, operating in Milwaukee, Wisconsin, and its suburbs; and The City Transit Company, operating in Dayton, Ohio, and its environs, and on charters wholly within Ohio.

11. The remaining prohibitions of § 204(a), see note 3, *supra,* do not extend to the mere act of regrooving a tire or, except dubiously, to the leasing of regrooved tires.

12. *Ante* p. 1302.

13. This practice is widespread in the motorbus industry. See Part IV, *infra.*

14. See note 3, *supra.*

15. National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89–563, tit. I, § 102(9), 80 Stat. 718 (1966), 15 U.S.C. § 1391(9) (1970).

16. The definitions provided in § 102 of the Act, 15 U.S.C. § 1391 (1970), are for the defined terms "[a]s used in . . . [T]itle [I]."

an orthodox definition of interstate commerce it supplies the meaning of that term when used in Title II, of which Section 204(a) is a part. On so much of the problem the parties seem agreed, but then the disagreement begins in earnest.

The transit systems do not question the authority of Congress to regulate intrastate activities which affect interstate commerce.[17] They argue, however, that transportation service performed wholly within the boundaries of a state is presumptively subject only to state controls,[18] and that the Act does not negate that presumption. On the other hand, the Secretary asserts that virtually all public roads are pathways of interstate commerce,[19] and that buses traveling those roads become inseparably intermingled with interstate traffic and thus are "introduc[ed]" into interstate commerce. Judge Robb rejects this rationale and substitutes his view that a vehicle equipped with regrooved tires is "introduced" therein because it is itself making or it is rationally presumed that some day it will make, an interstate trip.[20]

I cannot subscribe to that position.[21] The statutory and administrative embargo on regrooved tires applies, of course, to those mounted on vehicles actually moving in interstate commerce. Beyond that, however, I believe the embargo applies to their use, but only to their use, on public thoroughfares upon which interstate traffic is moving.

## II

The tone of the Act is set by the congressional declaration that its purpose "is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents."[22] To that end

---

17. See Katzenbach v. McClung, 379 U.S. 294, 301–305, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Heart of Atlanta Motel v. United States, 379 U.S. 241, 247, 248, 253–261, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 225–227, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963); NLRB v. Jones & Laughlin Steel Co., 301 U.S. 1, 31–32, 37–40, 57 S.Ct. 615, 81 L.Ed. 893 (1937); Wisconsin R. R. Comm'n v. Chicago, B. & Q. R. R., 257 U.S. 563, 579–591, 42 S.Ct. 232, 66 L.Ed. 371 (1922); Southern R. R. v. United States, 222 U.S. 20, 26–27, 32 S.Ct. 2, 56 L.Ed. 72 (1911); Hipolite Egg Co. v. United States, 220 U.S. 45, 51–58, 31 S.Ct. 364, 55 L.Ed. 364 (1911); Lottery Case (Champion v. Ames), 188 U.S. 321, 345–362, 23 S.Ct. 321, 47 L.Ed. 492 (1903). See generally Stern, The Scope of the Phrase Interstate Commerce, 41 A.B.A.J. 823, 871 (1955); Stern, That Commerce Which Concerns More States Than One, 47 Harv. L.Rev. 1335 (1934).

18. See note 40, *infra*, and accompanying text.

19. See discussion in Part III, *infra*.

20. *Ante* pp. 1303–1304.

21. Judge Robb's conclusion that transit buses are subject to the Act is rested partly on the likelihood that at some time in the future they will be driven from one state to another. That is an assumption unsupported by the record, and one which I am unable to share. I daresay that many motor vehicles—particularly old-model local transit buses as well as privately-owned jalopies having regrooved tires—will never venture anywhere near a state line. I believe, though, that when operated on public highways bearing interstate traffic, they all come under the ban of the Act.

Nor can I agree with Judge Robb's further conclusion that a regrooved tire is brought under the ban of the Act by an administrative presumption that at some future time it will travel interstate, whether it really does so or not. It is apparent that if that were the case, every regrooved tire produced since the effective date of the Act is encompassed by it, and the line which § 204(a) draws between interstate and intrastate commerce is obliterated. The activity statutorily banned, for present purposes, is the delivery of a regrooved tire for introduction into interstate—not intrastate—commerce. In my view, an actual introduction of the tire into interstate commerce is the constitutional fact upon which the validity of the statutory proscription depends, and the jurisdictional fact upon which administrative regulation must rest.

22. "Congress hereby declares that the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents. Therefore, Congress determines that it is

Congress found it "necessary," among other things, "to establish motor vehicle safety standards [23] for motor vehicles [24] and equipment [25] in interstate commerce," [26] and Congress gave each of these components a comprehensive meaning.[27] Importantly, a "motor vehicle" is "any vehicle driven or drawn by mechanical power manufactured primarily for use on the public streets, roads, and highways, except any vehicle operated exclusively on a rail or rails." [28] And "motor vehicle safety" is defined as "the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents . . . and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur. . . ." [29] It could hardly be more evident that, in the interest of public safety, Congress gave the Act an expansive coverage.

 In my view, every motor vehicle moving interstate or with interstate traffic on one or more regrooved tires is intercepted by the broad sweep of the Act. It bears repeating that Congress possessed the constitutional power to give the interdiction on regrooved tires that wide a range,[30] and but for some self-limitation found within the Act, it seems clear that we would be obliged to give Section 204(a) that effect. But unlike the transit appellants, I am unable to accept the Act's definition of interstate Commerce [31] as a delimitation —indeed, a destructive one—of the wide scope which Congress otherwise so plainly ordained for the Act.[32]

The statutory definition of interstate commerce is not unnaturally restrictive;

necessary to establish motor vehicle safety standards for motor vehicles and equipment in interstate commerce; to undertake and support necessary safety research and development; and to expand the national driver register." National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89–563, 80 Stat. 718 (1966), 15 U.S.C. § 1381 (1970).

23. " 'Motor vehicle safety standards' means a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." Id., tit. I, § 102(2), 80 Stat. 718 (1966), 15 U.S.C. § 1391(2) (1970).

24. See text *infra* at note 28.

25. " 'Motor vehicle equipment' means any system, part, or component of a motor vehicle as originally manufactured or any similar part or component manufactured or sold for replacement or improvement of such system, part, or component or as any accessory, or addition to the motor vehicle, any device, article or apparel not a system, part, or component of a motor vehicle (other than medicines, or eyeglasses prescribed by a physician or other duly licensed practitioner), which is manufactured, sold, delivered, offered, or intended for use exclusively to safeguard motor vehicles, drivers, passengers, and other highway users from risk of accident,

injury, or death." National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89–563, tit. I, § 102(4), 80 Stat. 718 (1966), as amended, 15 U.S.C. § 1391(4) (1970).

26. See text *supra* at note 15.

27. As previously stated, see text *supra* at note 16, § 102, the definitional section of the Act, 15 U.S.C. § 1391 (1970), is in terms confined to Title I. But the provisions of Title II complement those of Title I, and the definitions make clear the reach of the Act.

28. National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89–563, tit. I, § 102(3), 80 Stat. 718 (1966), 15 U.S.C. § 1391(3) (1970).

29. " 'Motor vehicle safety' means the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles." Id., tit. I, § 102(1), 80 Stat. 718 (1966), 15 U.S.C. § 1391(1) (1970).

30. See cases cited *supra* note 17.

31. See text *supra* at note 15.

32. See text *supra* at notes 22–29.

it is merely a restatement of the commonplace meaning of the term—a term, however, connoting a long reach.[33] Moreover, the statutory restriction on regrooved tires is not directly on their use on vehicles embarked on interstate travel but, in the congressional language with which we are more immediately concerned, on "deliver[y] for introduction" of such tires, or vehicles rolling on them, "in interstate commerce."[34] I encounter no difficulty whatever in reading that prohibition as an injunction, not merely against the operation of such tires and vehicles on interstate journeys, but also against their "deliver[y] for introduction" into the stream of interstate traffic. That construction is much more consonant with the comprehensive treatment the Act gives the matter of vehicle and equipment safety. It is more in keeping, too, with the express congressional purpose to preempt the field.

One of the basic considerations leading to adoption of the Act was the realization that "[w]hile the contribution of the several States to automobile safety has been significant, and justifies securing to the States a consultative role in the setting of standards, the primary responsibility for regulating the national automotive manufacturing industry must fall squarely upon the Federal Government."[35] In discharge of that responsibility, Section 103(d) of the Act flatly denies to the states authority to establish or continue in effect any motor vehicle or equipment safety standard not identical to the relevant federal standard, except higher standards for vehicles and equipment procured for their own use.[36] Thus Congress preempted virtually the entire field of safety standards to the extent of any applicable federal standard.[37]

Federal preemption in the area of highway safety hardly tolerates the notion of half-hearted invocation of the interstate commerce power. It connotes, rather, not only a federal purpose to move the states out but also a purpose to move the Federal Government in. Nor, without indulging in the ludicrous assumption that the possibility of a regulatory gap was left open,[38] can it be concluded that Congress contemplated less than full exploitation of the commerce power. Put another way, it seems "clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce."[39] I would abide that aim, and construe the coverage of the Act liberally to that end.[40]

33. See cases cited *supra* note 17.

34. See note 3, *supra*.

35. S.Rep.No.1301, 89th Cong., 2d Sess. 4 (1966), U.S.Code Cong. & Admin.News, p. 2712.

36. "Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard." National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No.89-563, tit. I, § 103(d), 80 Stat. 719 (1966), 15 U.S.C. § 1392(d) (1970).

37. See Chrysler Corp. v. Rhodes, 416 F. 2d 319, 322–323, 325 (1st Cir. 1969); Chrysler Corp. v. Tofany, 419 F.2d 499, 508–511 (2d Cir. 1969).

38. The states, of course, are under no compulsion to legislate on the subject. Thus the possibility—indeed the probability— of the regulatory gap mentioned in text.

39. Walling v. Jacksonville Paper Co., 317 U.S. 564, 567, 63 S.Ct. 332, 335, 87 L.Ed. 460 (1943).

40. This discussion, I submit, fully answers the contention of the transit appellants that Congress entrusted the regulation of tires on intrastate vehicles to the states.

## III

There are considerations additional to the statutory language which support the thesis that the normal daily operations of the transit systems' buses may "introduc[e]" them and their regrooved tires "in interstate commerce."[41] "In determining what constitutes 'commerce,'" we must be "guided by practical considerations,"[42] and the realities of motor vehicle traffic today make it evident that Congress must have intended that the Act's restraint on regrooved tires would treat motor vehicles in an interstate flow without distinction on account of origin or destination.

Our public roadways are the arteries of massive vehicular traffic. Vehicles headed interstate as well as those terminating intrastate abound our highways the length and breadth of the Nation. The Secretary asserts that practically all public thoroughfares serve the never-ending demands of interstate travel,[43] and that may well be, but in any event the fact in that regard is not critical to the question at hand. The important fact—one sufficiently notorious to legitimately attract judicial notice—is that with millions of motor vehicles traversing the vast network of public roadways across the country, it is well nigh inevitable that each[44] will, at some time or another during its service lifetime, share its route with one or more interstate travelers, whether or not it is itself then engaged in interstate travel. When it does have among its highway companions an interstate voyager, I am satisfied that a relationship supporting federal regulation has arisen.[45] And I have no doubt that as a class the buses utilized by the local transit industry are not per se outside the regulatory domain.[46]

It cannot be gainsaid that a motor vehicle on an intrastate trip, no less than one proceeding interstate, is a constant and serious threat to the traffic movement on its route if its tires are unsafe. The tire that fails is selective neither of the vehicles nor the occupants which it is likely to victimize; an untrustworthy tire jeopardizes closeby interstate and intrastate travel alike. In light of the stated legislative goal of "reduc[ing] traffic accidents and deaths and injuries to persons resulting from traffic accidents,"[47] it is incongruous that Congress would restrict the use of regrooved tires on vehicles journeying interstate and at the same time leave closeby vehicles bound intrastate wholly free to use them. If indeed Congress has not made its wish manifest from

41. See note 3, *supra*.

42. Overstreet v. North Shore Corp., 318 U.S. 125, 128, 63 S.Ct. 494, 87 L.Ed. 656 (1943).

43. The transit appellants point out that the particular streets and roads over which their buses provide service are not specified or otherwise identified in the record. In the view I take of the matter, that is immaterial. See the discussion following in text.

44. It will be recalled that the only type of motor vehicle to which the Act applies is one "manufactured primarily for use on the public streets, roads, and highways, . . ." National Traffic and Motor Vehicle Safety Act of 1966, Pub.L.No. 89-563, tit. I, § 102(3), 80 Stat. 718 (1966), 15 U.S.C. § 1319(3) (1970), quoted in text *supra* at note 28.

45. See cases cited *supra* note 17.

46. There are some 1,100 local transit systems across the United States operating about 50,000 motor buses and transporting annually more than 6.5 billion revenue passengers.

47. See note 22, *supra*. As the Senate Commerce Committee stated:

It should not be necessary to call again the grim roll of Americans lost and maimed on the Nation's highways. Yet the compelling need for the strong automobile safety legislation which the Commerce Committee today is reporting lies embodied in those statistics: 1.6 million dead since the coming of the automobile; over 50,000 to die this year. And, unless the accelerating spiral of death is arrested, 100,000 Americans will die as a result of their cars in 1975.

S.Rep.No.1301, 89th Cong.2d Sess. at 1-2 (1966), U.S.Code Cong. & Admin.News, p. 2709.

what it has said, I would not attribute such an extraordinary regulatory technique to the effort that culminated in the Act.

Lest it be forgotten, the statutory prohibition on regrooved tires related to the issue at hand is specifically on their "deliver[y] for introduction in interstate commerce."[48] The Secretary's regulations seem to outlaw no more.[49] When a regrooved tire makes its appearance on a public thoroughfare traversed by vehicles moving toward interstate destinations, it is clear enough to me that there has been an "introduction" of the tire and its bearer-vehicle into the stream of interstate commerce, irrespective of where that vehicle is going or coming from. In a very real sense, the vehicle and its regrooved tire have become "so closely related to such commerce as to be in practice and in legal contemplation a part of it."[50] For purposes of determining the applicability of the statutory and administrative interdictions, I would recognize that relationship for what it actually is.

What so plainly emerges for me from a reading of the statutory language in the context of traffic reality draws strong support from the case law. The phrase "introduction in interstate commerce" seems not itself to have received a reported judicial construction, but a term of analogous import has received attention in the courts. In Overstreet v. North Shore Corporation,[51] the Supreme Court was called upon to investigate the limits of the phrase "engaged in commerce" as used in the Fair Labor Standards Act of 1938.[52] The issue was whether employees of a private corporation engaged in maintaining and operating a toll road and drawbridge over a navigable waterway were so engaged under the Act. Answering the question in the affirmative, the Court pointed out that "[v]ehicular roads and bridges are . . . indispensable to the interstate movement of persons and goods,"[53] and that "[i]f they are used by persons and goods passing between the various States, they are instrumentalities of interstate commerce."[54] Accordingly, the Court held, "[t]hose persons who are engaged in maintaining and repairing such facilities should be considered as 'engaged in commerce,'"[55] and so also should "operational employees whose work is just as closely related to the interstate movement."[56]

This example could be repeated, but it suffices to note that by no means does *Overstreet* stand alone.[57] The relevance of the "engaged-in-commerce" cases to our problem lies in the readiness with

---

48. See note 3, *supra*.

49. See note 4, *supra*.

50. Overstreet v. North Shore Corp., *supra* note 42, 318 U.S. at 129, 63 S.Ct. at 497, quoting Pedersen v. Delaware, L. & W. R.R., 229 U.S. 146, 151, 33 S.Ct. 648, 57 L.Ed. 1125 (1913).

51. *Supra* note 42.

52. Act of June 25, 1938, ch. 676, §§ 6(a), 7(a), 52 Stat. 1062–1063, as amended, 29 U.S.C. §§ 206(a), 207(a) (1970). That legislation defines "commerce" as "trade, commerce, transportation, transmission, . or communication among the several States or between any State and any place outside thereof." *Id.* § 3(b), 52 Stat. 1060, as amended, 29 U.S.C. § 203(b) (1970).

53. Overstreet v. North Shore Corp., *supra* note 42, 318 U.S. at 129, 63 S.Ct. at 497.

54. *Id.* at 129–130, 63 S.Ct. at 497.

55. *Id.* at 130, 63 S.Ct. at 497.

56. *Id.*

57. Compare Alstate Constr. Co. v. Durkin, 345 U.S. 13, 15–17, 73 S.Ct. 565, 97 L.Ed. 745 (1953); Boutell v. Walling, 327 U.S. 463, 466, 66 S.Ct. 631, 90 L.Ed. 786 (1946); Walling v. McGrady Constr. Co., 156 F.2d 932, 934–936 (3d Cir.), cert. denied, 329 U.S. 785, 67 S.Ct. 298, 91 L.Ed.2d 673 (1946); Crook v. Bryant, 265 F.2d 541, 542–544 (4th Cir. 1959); Emulsified Asphalt Prods. Co. v. Mitchell, 222 F.2d 913, 914 (6th Cir. 1955); Wirtz v. Crystal Lake Crushed Stone Co., 327 F.2d 455, 458 (7th Cir. 1965); Austford v. Goldberg, 292 F.2d 234, 236–239 (8th Cir. 1961); Walling v. Craig, 53 F.Supp. 479, 483 (D.Minn. 1943).

which the "practical" test [58] of relationships to commerce provides the solution.[59] Like the intrastate bus driver, neither the road maintainer, the toll gatherer nor the drawbridge operator is himself making an interstate trip, but each performs a function in which a potential impact upon interstate traffic inheres. The vital inquiry in these cases "is not whether the . . . activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it." [60]

That, in my view, is the standard for determining whether a regrooved tire on a vehicle making an intrastate journey on a public highway upon which interstate traffic is moving has been "introduc[ed] in interstate commerce." It matters not that the vehicle in question begins and ends its trip within a single state. The vehicle's presence on the highway far surpasses "activities [which merely] affect or indirectly relate to interstate commerce." [61] When it intermingles with vehicles comprising the interstate flow, in the most literal sense it is "actually in" and "so closely related to the movement of the commerce as to be a part of it." [62] By any "practical" measure of the situation,[63] I submit, the vehicle has been "introduc[ed] in interstate commerce." [64]

The Secretary has concluded similarly. He holds that notwithstanding that the buses of local transit systems are solely on intrastate runs, the prohibitions of the Act may obtain. As a contemporary administrative interpretation of a law entrusted to the Secretary's administration, the regulations are entitled to great weight in court.[65] Beyond that, I consider that construction of the Act to be eminently correct. I would accord the regulations the respect they are due, and sustain them for the reasons discussed.

## IV

My second disagreement is with the court's holding that the Secretary's exemption regulation, which removes from the ban of Section 204(a) all regrooved tires meeting specified standards,[66] is invalid to the extent that it allows such tires to be delivered for introduction into interstate commerce.[67] While a literal construction of Section 204(a) might suggest that result,[68] its practical effect is a substantial negation of the exemption power conferred by that section and, in my view, an unrealistic restriction on administrative policy in regard to regrooved tires. I submit that the exemption clause of Section 204(a) summons, rather, a liberal interpretation which will enable achievement of the purposes which Congress manifestly had in mind and that, given that construction, the regulation must be sustained.

Congress framed the prohibitory portion of Section 204(a) in terms of a ban on "sell[ing], offer[ing] for sale, or in-

58. See text *supra* at note 42.

59. See, e. g., Overstreet v. North Shore Corp., *supra* note 42, 318 U.S. at 128–130, 63 S.Ct. 494.

60. McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538 (1943). See also Overstreet v. North Shore Corp., *supra* note 42, 318 U.S. at 129, 63 S.Ct. 494.

61. See text *supra* at note 60.

62. See text *supra* at note 60.

63. See text *supra* at note 42.

64. Compare Southern Ry. v. United States, 222 U.S. 20, 24–27, 32 S.Ct. 2, 56 L.Ed. 72 (1911).

65. Udall v. Tallman, 380 U.S. 1, 11, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Power Reactor Dev. Co. v. International Union of Elec., Radio & Mach. Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed. 2d 924 (1961); United States v. American Trucking Ass'n, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1949); Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 324–325, 53 S.Ct. 350, 77 L.Ed. 796 (1933); Fawcus Mfg. Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397 (1931).

66. 49 C.F.R. § 569.7(a) (1972), quoted in part *supra* note 4.

67. *Ante* pp. 1303–1304.

68. See note 3, *supra*.

**1312**

troduc[ing] for sale or deliver[y] for introduction in interstate commerce, any" regrooved tire.[69] In fashioning the exception to that general prohibition, however, Congress stated "that the Secretary may by order permit the sale of regrooved tires and motor vehicles equipped with regrooved tires which he finds are designed and constructed in a manner consistent with the purposes of" the Act.[70] At first blush, then, it might appear that the Secretary's exemption power is narrower than the statutory injunction; in other words, that while the Secretary may license "sale[s]" of regrooved tires and motor vehicles mounting regrooved tires which qualify for exemption, he lacks authority, irrespective of the circumstances, to sanction any of the other forbidden activities.[71]

If that be so, the regulation on regrooved tires is overbroad, for it would allow sales and, as well, "offer[s] for sale, introduc[tions] for sale [and] deliver[ies] for introduction into interstate commerce" if the tires conform to specified requirements.[72] Thus the regulation would countenance both sale and nonsale transactions culminating in an introduction of regrooved tires into interstate channels provided they meet standards which the Secretary deems harmonious with congressional objectives.

I think the regulation reads the purposes of Section 204(a)'s exemption clause correctly. When a court is called upon to interpret a statute, its first and primary source of legislative intent is the language which the legislature saw fit to employ.[73] But "literalness may

strangle meaning," [74] and a literal meaning may be rejected "where acceptance of that meaning would lead to absurd results, . . . or would thwart the obvious purpose of the statute . . . ."[75] By my estimate, precisely those consequences follow from the interpretation which the majority places on the exemption clause.

A literal construction of that clause produces anomalous results. The clause unmistakably grants the Secretary power to except sales of regrooved tires when they satisfy his design and construction standards, but it does not explicitly authorize the exception of anything but a "sale." [76] Nonetheless, since tires can hardly be sold without previous offer and introduction for that purpose, it must necessarily follow, as the regulation provides,[77] that regrooved tires which qualify under the exemption for sale can also be offered and introduced for sale. But if Section 204(a) is read according to its letter, not even qualified regrooved tires can be delivered for introduction—through a nonsale transaction—into interstate commerce as the exemption regulation further provides. My colleagues give the exemption clause of Section 204(a) that reading, and hold that the exemption regulation is invalid to the extent that it undertakes to provide to the contrary.[78]

This interpretation ignores the realities of regrooved-tire usage, and wreaks havoc upon that usage. The record contains unchallenged facts portraying the role of the regrooved tire in motor carrier operations, and those facts may profitably be recounted. Major tire

69. See note 3, *supra.*

70. See note 3, *supra.*

71. See *ante* pp. 1303–1304.

72. See note 4, *supra.*

73. *E. g.,* Maryland & D. C. Rifle & Pistol Ass'n v. Washington, 142 U.S.App.D.C. 375, 378, 442 F.2d 123, 126 (1971).

74. Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962), quoting Utah Junk Co. v. Porter, 328

U.S. 39, 44, 66 S.Ct. 889, 90 L.Ed. 1071 (1966).

75. Helvering v. Hammel, 311 U.S. 504, 510–511, 61 S.Ct. 368, 371, 85 L.Ed. 303 (1941), citing United States v. Katz, 271 U.S. 354, 362, 46 S.Ct. 513, 70 L.Ed. 986 (1926); Haggar Co. v. Helvering, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940).

76. See note 3, *supra.*

77. See note 4, *supra.*

78. *Ante* pp. 1303–1304.

manufacturers produce commercial tires which are specially designed for regrooving, after the original tread becomes worn, without degradation of tire quality or compromise of safety. Some operators purchase these tires, use them and, when the time arrives, do the regrooving themselves or arrange for it to be done. Many others lease regroovable tires, on a mileage basis, from manufacturers who perform the maintenance and regrooving services. If the court's construction of the exemption clause of Section 204(a) is correct, these techniques are now taboo.

The use of regrooved tires of regroovable quality in commercial transportation is widespread and, from all that appears from the record, is innocuous.[79] In 1967—shortly before the advent of the Act—more than a half-million regrooved tires were in service in the United States. Then, with but one exception, regrooved tires were used by every urban and interurban fleet of more than 50 buses, and by every taxicab fleet of more than 100 units. Over the many years that the practice of regrooving commercial tires has endured, they have enjoyed an enviable record for highway safety. One leading tire manufacturer reports the regrooving of nearly two million bus and taxicab tires over a twenty-year period without any record of tire failure caused by regrooving. Another boasts an unblemished accident record for the same period, and still an-other for a ten-year span and seven billion vehicles miles.

Viewed against this backdrop, I am unable to accept the sale-nonsale distinction as a proper interpretative consequence of Section 204(a)'s exemption clause. The central theme of the Act is highway safety,[80] and that distinction bears no relationship whatever to that objective. I cannot believe that Congress intended that a regrooved tire fit for sale in interstate commerce would be deemed unfit for use in interstate commerce simply because it was introduced by a process other than sale. I cannot believe that Congress intended to differentiate tires, in terms of the exemption power, merely according to the nature of the transaction by which they reach an interstate channel. Nor can I believe that Congress intended to outlaw arrangements by which the tire industry has made regroovable and regrooved tires available to the motor carrier industry without any visible danger to interstate commerce.[81]

The inclusion of the exemption clause in Section 204(a) makes it evident that Congress felt that regulated tire-regrooving is perfectly feasible, and that the Secretary is capable of devising standards by which safe and unsafe regrooved tires can be distinguished. The Secretary's regulation exempts only tires which are designed for the regrooving process,[82] and which are regrooved in conformity with specified require-

---

79. I speak only of commercial tires specially designed and manufactured for regrooving. The practice of regrooving passenger car tires is universally condemned. See S.Rep.No.1089, 89th Cong., 2d Sess. 5 (1966).

80. See Part II, *supra*.

81. The record leaves unclear the extent to which tires already regrooved, as distinguished from regroovable tires, are *sold*. But the record makes it ever so plain that the leasing of regroovable tires is very widespread. Indeed, some leading tire manufacturers make such tires available only on a leasing basis. In such instances, the tire remains largely under the supervision and control of the manufacturer throughout its service lifetime, with concomitant contributions to the safety of its use.

82. One of the requirements which regrooved tires must meet is that "[t]he tire being regrooved shall be a regroovable tire." 49 C.F.R. § 369.7(a)(1) (1972). "Regroovable tire" is defined as "a tire, either original tread or retread, designed and constructed with suffficient tread material to permit renewal of the tread pattern or the generation of a new tread pattern in a manner which conforms to" the regulation. *Id.* § 369.3 (c) (1972).

**1314**

ments.[83] Abiding ample precedent,[84] and construing the exemption clause in light of the Act's pervading goal of traffic safety,[85] I would accept that clause as a grant to the Secretary of authority to sanction interstate uses of all regrooved tires which meet the requirements his regulation has set.

83. *Id.* § 369.7(a)(1)–(6) (1972).

84. See cases cited *supra* notes 74–75.

85. Compare FTC v. Fred Meyer, Inc., 390 U.S. 341, 354–357, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968); First Nat'l Bank v. Walker Bank & Trust Co., 385 U.S. 252, 261–262, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); Hudson Distributors, Inc. v. Eli Lilly & Co., 377 U.S. 386, 392–394, 84 S.Ct. 1273, 12 L.Ed.2d 394 (1964); Commissioner v. Bilder, 369 U.S. 499, 502–504, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962).